Emil E. JANKEE and Mary Jankee, Plaintiffs-Appellants,†

v.

CLARK COUNTY, Wisconsin Health Care Liability Insurance Plan, Defendants-Respondents-Cross-Appellants,†

CONTINENTAL CASUALTY CO., Hammel, Green & Abrahamson, Inc., Defendants-Respondents-Cross-Appellants-Cross-Respondents,

WAUSAU UNDERWRITERS INS. CO., J.P. Cullen & Sons, Inc., St. Paul Fire & Marine Ins. Co., and Wausau Metal Corp. d/b/a Milco, Defendants-Respondents-Cross-Respondents,

WISCONSIN DEPARTMENT OF HEALTH AND SOCIAL SERVICES, Defendant.

Court of Appeals

*No. 95–2136. Oral argument June 10, 1998.—Decided September 24, 1998.*

(Also reported in 585 N.W.2d 913.)

†Petition to review granted.

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Ronald G. Tays* and *Hope K. Olson* of *Previant, Goldberg, Uelmen, Gratz, Miller & Brueggeman, S.C.* of Milwaukee.

On behalf of the defendants-respondents-cross-appellants Clark County and Wisconsin Health Care Liability Insurance Plan, the cause was submitted on the briefs of *Timothy F. Mentkowski* and *Mary E. Nelson* of *Crivello, Carlson, Mentkowski & Steeves, S.C.* of Milwaukee.

On behalf of the defendants-respondents-cross-appellants-cross-respondents Continental Casualty Co. and Hammel Green and Abrahamson, Inc., the cause was submitted on the briefs of *Timothy R. Murphy* of *Askegaard & Robinson, P.A.* of Brainerd, Minnesota.

On behalf of the defendants-respondents-cross-respondents Wausau Underwriters Ins. Co. and J.P. Cullen & Sons, Inc., the cause was submitted on the

brief of *Wayne R. Luck* of *Law Offices of Stilp and Cotton* of Appleton.

On behalf of the defendants-respondents-cross-respondents St. Paul Fire & Marine Ins. Co. and Wausau Metals Corp., d/b/a/ MILCO, the cause was submitted on the brief of *John P. Richie* of *Misfeldt, Stark, Richie & Wickstrom* of Eau Claire.

Before Vergeront, Roggensack and Deininger, JJ.

VERGERONT, J.   Emil Jankee[1] sustained serious injuries when he fell while attempting to escape through a window on the third floor of the Clark County Health Care Center (CCHCC) where he was involuntarily confined under Chapter 51, STATS., the Mental Health Act. He appeals the summary judgment dismissing his complaint against Clark County, the architectural firm that renovated CCHCC, the general contracting firm, and the subcontractor that manufactured and provided the windows. Jankee contends the trial court erred in ruling, as a matter of law, that the contractors are immune under the government contractor immunity doctrine established in *Lyons v. CNA Ins. Co.*, 207 Wis. 2d 446, 558 N.W.2d 658 (Ct. App. 1996); and the trial court erred in ruling that Jankee's negligence was equal to or greater than the negligence of each defendant. The County cross-appeals the court's ruling that the contractors are immune from suit.

Although our analysis differs somewhat from that of the trial court on the government contractor immunity defense, we agree that all three contractors are

---

[1] Emil Jankee and Mary Jankee are the plaintiffs and the appellants. For ease of reference, we will refer only to Emil Jankee.

entitled to immunity as a matter of law.[2] However, we conclude that the trial court erred in deciding that, as a matter of law, Jankee's contributory negligence was equal to or greater than the County's negligence. We hold that if Jankee did not have the capacity, when he escaped, to control or appreciate his conduct by virtue of his mental illness, he is not contributorily negligent on his claims against the County, and we conclude there are disputed issues of fact concerning whether he had that capacity. We therefore affirm in part, reverse in part, and remand.

## BACKGROUND[3]

*Design and Installation of Window*

CCHCC is a nursing home and psychiatric hospital. In the early 1980s it began a major renovation of its building and hired the firm Hammel, Green and Abrahamson, Inc. (HGA) as the architect for the project. During the program and design development phases of the project there were numerous meetings between CCHCC personnel and HGA personnel in which CCHCC personnel explained the needs and concerns that the renovation had to take into account, including the renovations for the chronically mentally ill (CMI) unit on the third floor. This was a locked unit, and patients there included those who were involuntarily committed to CCHCC. Daniel Swedberg, HGA principal architect and project manager, and Michael Pederson, also of HGA, discussed with CCHCC

---

[2] Because of this conclusion, we need not address whether the open and obvious danger doctrine bars Jankee's recovery against the window manufacturer.

[3] For purposes of this motion, the facts in the background section are not disputed unless specifically noted.

administrator Arlyn Mills and CCHCC staff the ventilation, security and other needs CCHCC wanted considered in the renovation of the unit. HGA and CCHCC personnel jointly made the decision to install fixed pane windows that did not open in the isolation and security rooms and use air conditioning for ventilation in those rooms. However, in the rest of the CMI unit CCHCC wanted the windows to open. Mills ruled out security bars and security screens because he wanted to create a therapeutic, rather than prison-like, environment in the rest of the unit. Also, windows that open would not require use of air conditioning, a cost concern. Swedberg had discussions with CCHCC personnel concerning the need for hardware on these windows to limit the opening and to keep them from being opened by the residents.

Based on the programming desires of CCHCC, the discussions with CCHCC personnel, and various state and federal requirements, HGA drafted the performance specifications for the project. The specifications for the windows in the regular CMI unit (not the windows in the isolation and security rooms) and in other parts of the building called for horizontal rolling windows manufactured by MILCO, series W–21T (or one of two acceptable alternative manufacturers), with insect screens. The specifications for the operable hardware were: "Operable sash hardware: Manufacturer's standard type to suit sash operations; except with removable stop to lock operable sash in 5" open position; horizontal sliding units with key operated locking device and non-liftout device;[4] and casements units with removable handle cranks." (Footnote added.)

---

[4] The non-liftout device was a solid aluminum stop six inches long installed in the head of the window above the sash. Its purpose was to prevent someone from lifting the sash out of

HGA selected the particular window and sash hardware described in the specifications based on the information it received from CCHCC personnel about the purposes they wanted the windows to serve, and based on HGA's own knowledge about the type of application that would best carry out those purposes. The recommendation of a five-inch open position was made by Swedberg because six inches was the guideline for the distance between railings to keep persons from falling through; he wanted to be more cautious in order to prevent a resident from getting out the window. The window specifications were approved by the County.

HGA and the County entered into a contract with J.P. Cullen & Sons, Inc. as general contractor for the project, and Cullen entered into a subcontract with MILCO for the windows. As part of the bidding process, MILCO submitted shop drawings of its proposed products to Cullen, which submitted them to HGA for review and approval. To meet the specifications of both the locking device and the removable stop, MILCO proposed one device, a cube stop, which MILCO had designed. The cube stop is a one-half-inch metal cube placed anywhere in the upper track of the window and tightened with a screw that can be turned with a special allen wrench. The cube stop can be placed so the window opens only five inches (or any other distance up to the fully open position); it can be removed, with an allen wrench, so that the window opens to any distance without a stop; and it can be placed so that it locks the window in a closed position. HGA approved MILCO's drawings as meeting the specifications.

While the renovation of the CMI unit was taking place, those patients were temporarily housed in

the opening. The non-liftout device did not limit sash travel. It is not involved on this appeal.

another part of the building. Sometime after the windows and cube stops had been installed in that other part of the building, it came to Mills' attention that a patient had managed to loosen the cube stop. Mills contacted Larry Stenz, HGA's architectural representative for the project, explained the problem, and asked for a redesign of a device to limit the window opening. Stenz contacted George Parks of Cullen, who contacted Richard Rayborn, general manager of MILCO, regarding a redesign. Rayborn suggested channel stops of fifteen-and-one-half inches to make the windows more secure by allowing only four inches of sash travel, which would limit the opening to three inches. Rayborn confirmed this proposal in an April 6, 1984 letter to Richard Pelton of Cullen along with a quoted price. Pelton conveyed the quoted price to Stenz by a letter summarizing the proposal as "$860.00 for 45 window stops." However, Pelton's letter does not show that Rayborn's letter, which specifically described the stops as fifteen-and-one-half inches long and limiting sash travel to four inches, was enclosed.

HGA prepared a change order including "window stops (45) at 3rd floor center" at the quoted price; it was signed by Cullen, HGA and the County Board of Supervisors. MILCO installed the channel stops on April 25, 1984. The channel stop was an aluminum bar that was screwed into the top channel of the window frame, such that it stopped the window at an opening of three inches. The channel stop did not function as a lock, so if one wanted to lock the windows closed from the inside, the cube stop would still be needed for that purpose.

In November 1984, when HGA was inspecting the project to see what remained to be done, it noticed that the windows in the regular CMI unit opened only three inches. Pederson, Stenz and Swedberg all testified that

158

they were not aware that the change order called for an opening smaller than five inches. Pederson noted the discrepancy in a "punch list" sent to Pelton, and Pelton contacted MILCO. MILCO wrote to Pelton, enclosing a copy of Rayborn's April 6, 1984 letter and stating that MILCO had never been advised that the channel stops should allow for a five-inch opening. MILCO offered to modify the stops to permit such an opening at an additional cost. Pelton passed these two letters from MILCO on to HGA. There is no document in the record suggesting that HGA, Cullen or MILCO were involved in modifying the stops after this exchange of correspondence.

In 1987 a patient attempted an escape from the CMI unit by unscrewing a channel stop and climbing out the window. After an investigation, the County concluded that the patient was able to do this because of his unique skills and that the channel stops, as they existed at that time, were a sufficient security measure. The County therefore decided to leave the channel stop system in place as it existed at that time.

*Jankee's Escape Attempt*

Jankee was involuntarily committed to CCHCC in a Chapter 51 proceeding on the ground that he was a danger to himself and others. *See* ch. 51, STATS. He was treated for bipolar affective disorder, also called manic depressive illness, and placed on medications. Jankee's sleeping room looked out over the second floor roof, which extended beyond his room. On July 26, 1989, at about midnight, Jankee removed the cube stop from the window in his room by using a toothbrush to pry it out. He then apparently opened the window wider, broke the screen, and forced the window sash against the channel stop, causing the window to open a little

wider at the bottom. He squeezed through this opening, landed on the second floor roof, and lowered himself to a brick ledge on the second story. He fell backwards off the ledge, fracturing his back. He was found lying on the ground at about 5:55 a.m.

After Jankee's escape, John Sigmund of MILCO inspected the window at the County's request. He observed that the ends of the channel stop had been cut off. He recommended that the County install fifteen-and-one-half inch channel stops on both the top channel and the sill.

Jankee and the County contend that the evidence shows that Cullen shortened the channel stops to make the opening five inches rather than three inches, while the contractors contend that the evidence shows that CCHCC maintenance staff did so.

*Court Proceedings*

Jankee filed a complaint against Clark County asserting claims of negligence and a violation of the safe place statute, § 101.11, STATS., for failing to provide proper supervision and a safe place for Jankee while he was in the County's custody and control. He asserted claims of negligence in the design and construction of the windows against HGA and Cullen, and claims of negligence and strict liability against MILCO for failure to design and manufacture a reasonably safe product and failure to warn of the defective and dangerous condition of the window for use in a locked psychiatric ward.

The defendants moved for summary judgment. The trial court granted the motions, dismissing all

claims against all defendants.[5] The court concluded that HGA, Cullen and MILCO were all entitled to immunity as government contractors under *Lyons v. CNA Ins. Co.*, 207 Wis. 2d 446, 558 N.W.2d 658 (Ct. App. 1996), because the County had approved reasonably precise specifications regarding the windows; the windows met those specifications, which included the change order approved by the County; and there was no danger in the use of the windows that was known by any contractor but unknown to the County which the contractor did not disclose. The court also concluded that Jankee's contributory negligence was to be judged by the reasonable person standard and, applying that standard, his negligence exceeded any negligence of each of the four defendants as a matter of law.

## DISCUSSION

We review summary judgments de novo, employing the same methodology as the trial court. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315–17, 401

---

[5] The trial court originally denied the motions of the County, HGA and Cullen for summary judgment, granting summary judgment only to MILCO on the ground that MILCO had an absolute defense based on the open and obvious danger doctrine. While the appeal of that order was pending, MILCO asked this court to modify the briefing schedule to permit it to brief the issue of the government contract immunity defense, based on the recently decided *Lyons v. CNA Ins. Co.*, 207 Wis. 2d 446, 558. N.W.2d 658 (Ct. App. 1996). We denied that motion but, on our own motion, remanded to the trial court on that issue. At the hearing before the trial court on remand, the court heard argument on the application of the government contractor immunity defense to HGA, Cullen and MILCO, and heard the reconsideration motions of the County, HGA and Cullen.

N.W.2d 816, 820–21 (1987). Generally, summary judgment is proper where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.* In deciding if there are genuine issues of material fact, we are required to draw all reasonable inferences from the evidence in favor of the non-moving party. *Grams v. Boss*, 97 Wis. 2d 332, 339, 294 N.W.2d 473, 477 (1980).

*Government Contractor Immunity Defense*

Jankee contends that the trial court erred in concluding that the government contractor immunity defense was available to HGA, Cullen and MILCO because they are not agents of the County within the meaning of § 893.80, STATS.[6] Both Jankee and the County contend that, even if the defense is available, the trial court erred in deciding that the contractors had presented undisputed facts showing that they were entitled to the defense.[7]

---

[6] Section 893.80(4), STATS., provides:

(4) No suit may be brought against any . . . political corporation, governmental subdivision or any agency thereof for the intentional torts of its officers, officials, agents or employes nor may any suit be brought against such corporation, subdivision or agency or volunteer fire company or against its officers, officials, agents or employes for acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions.

[7] Jankee also argues that the contractors waived the immunity defense because they did not plead it in their answers as an affirmative defense. However, the trial court upon remand allowed the contractors to amend their answers to include this defense. Courts have the discretion to permit an amendment to the pleadings to raise a defense of immunity, *see Anderson v. City of Milwaukee*, 208 Wis. 2d 18, 34 n.14, 559 N.W.2d 563, 570 (1997), and the contractors assert that the trial court properly did so. Jankee does not explain in his reply brief why the trial

In *Lyons*, "we adopt[ed] a form of governmental contractor immunity applicable to parties who contract with municipal or state authorities and are directed to perform certain tasks under that contract." *Lyons*, 207 Wis. 2d at 457, 558 N.W.2d at 663. We held:

> An independent professional contractor who follows official directives is an "agent" for purposes of § 893.80(4), STATS., or is entitled to common law immunity[8] when:
>
> (1)   the governmental authority approved reasonably precise specifications;
>
> (2)   the contractor's actions conformed to those specifications; and
>
> (3)   the contractor warned the supervising governmental authority about the possible dangers associated with those specifications that were known to the contractor but not to the governmental officials.

*Id.* at 457–58, 558 N.W.2d at 663 (footnote added). We began our discussion by observing that the bridge design decisions at issue in *Lyons* were within the discretionary decision making that is protected by governmental immunity under both statutory and

court erroneously exercised its discretion in permitting the amendment upon remand. We therefore do not consider this issue further. *See Schlieper v. DNR*, 188 Wis. 2d 318, 322, 525 N.W.2d 99, 101 (Ct. App. 1994).

[8] We made the distinction between the statute and common law immunity after noting that, while the statute does not apply to state officers and employees, common law immunity for state officers and employees is equivalent to that granted under the statute to municipal officers and employees. *Lyons v. CNA Ins. Co.*, 207 Wis. 2d 446, 453, 558 N.W.2d 658, 661 (Ct. App. 1996). The governmental unit involved in the bridge design at issue in *Lyons* was the Wisconsin Department of Transportation.

common law. *Id.* at 453, 558 N.W.2d at 661. We were persuaded that when a contractor was merely acting as an agent for the governmental unit that retained ultimate responsibility for design decisions, the contractor should also have immunity. *Id.* at 453–54, 558 N.W.2d at 661. Otherwise, the courts would still have to examine the merits of what is essentially a political decision, which is what the government immunity defense is designed to prevent. *Id.*

The three-part test we adopted in *Lyons* was established for military equipment manufacturers in *Boyle v. United Tech. Corp.*, 487 U.S. 500, 512–13 (1988). We concluded that the goals served by the test supported extending the test to the engineering field. *Lyons*, 207 Wis. 2d at 457, 558 N.W.2d at 663. Citing *Boyle*, we explained that the first two parts of the test ensure that the challenged design is within the class of official decisions that should be insulated from judicial scrutiny, and that the design feature was actually reflected upon by the governmental official. *Lyons* at 457, 558 N.W.2d at 663. The third part of the test ensures that the contractor will not ignore its duty to the public and withhold information about dangers the government might not know about. *Id.* "By requiring the contractor who seeks immunity to show that it informed the government about hidden flaws, society is ensured that governmental officers and officials get all the information necessary to support a proper discretionary choice." *Id.* We summarized the test's purpose in this way:

> [It] will ensure that state and municipal government, and the public at large, is able to make the best use of professional design assistance, but that professional contractors are not unfairly burdened

164

by lawsuits when they follow governmental directives.

*Id.* at 458, 558 N.W.2d at 663.

Lyons readily disposes of Jankee's argument that the defense does not apply to Cullen and HGA because they are not "agents" within the meaning of § 893.80(4), STATS. In *Lyons,* we expressly held that an independent contractor meeting the three-part test was an agent within the meaning of § 893.80(4). *Lyons,* 207 Wis. 2d at 457, 558 N.W.2d at 663. The earlier case that Jankee relies on, *Kettner v. Wausau Ins. Co.,* 191 Wis. 2d 723, 530 N.W.2d 399 (Ct. App. 1995), did not concern government contractor immunity. The issue in *Kettner* was whether the bus driver, under contract with a school, was an agent within the meaning of § 893.80(3) so as to trigger the statutory damage cap. *Id.* at 729–30, 530 N.W.2d at 401. We decided that "agent" meant those agents who had a master-servant relationship with the government, not simply independent contractors. *Id. Lyons,* not *Kettner,* establishes the test the contractors in this case must meet for a defense of government contractor immunity.

Jankee argues that the defense is not available to MILCO because it does not have a contract with the County, but only with Cullen. *Lyons* does not directly address the issue of whether the defense is available to subcontractors who meet the three-part test, because the engineering firm sued in *Lyons* had a contract with the state. However, we are persuaded that our reasoning for adopting the defense for contractors also applies to subcontractors if the three-part test is met. If MILCO could not assert the defense, the purpose of adopting the defense for contractors is undermined: the court would be put in the position of examining the

165

merits of what are essentially political choices in a suit against the subcontractor, rather than a suit against the contractor. Moreover, it is just as unfair for a subcontractor to be subjected to suit for carrying out a governmental directive as it is for the party directly contracting with the government. Jankee has provided us with no authority limiting the government contractor immunity defense to direct contracts with the government, and we are aware of one court that has rejected this argument. *See Feldman v. L & M Radiator, Inc.*, 918 S.W.2d 615, 625 (Ct. App. Tex. 1996). We conclude the defense is available to MILCO as well as HGA and Cullen.

We now address the contention of Jankee and the County that there are disputed issues of fact concerning whether the three contractors have met the three-part test we adopted in *Lyons*. We agree with Jankee that, in order to meet the first part of the test, the governmental unit must do more than simply accept, without any substantive review or evaluation, the contractor's exercise of discretion in meeting a given performance standard. *See Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 999 (7th Cir. 1996). We also observe that courts in other jurisdictions have emphasized that the test must be applied to the particular features of the product claimed to be defective, rather than the product or project as a whole. *See Bailey v. McDonnell Douglas Corp.*, 989 F.2d 794, 799 (5th Cir. 1993); *Gray v. Lockheed Aeronautical Sys. Co.*, 880 F. Supp 1559, 1566 (N.D. Ga. 1995), *aff'd and remanded* 125 F.3d 1371 (11th Cir. 1997), *judgment vacated on other grounds*, 118 S. Ct. 2317 (1998). We find this principle

sound, and therefore begin by summarizing the opinions of Jankee's expert, architect Robert Young.[9]

Young opined that the windows installed in the regular CMI unit departed from accepted design standards because they opened; they should either have been pane windows that did not open, with an adequate ventilation system, or windows that opened but with security screens. He also opined that the cube stops and channel stops were not safe for the purpose for which they were intended—limiting the opening of the window—because they were not integral components of the window and could be pried or moved. Also, since these stops attached only at the top channel, they permitted the bottom of the window to be opened wider.[10] He had no opinion on how narrow the window opening should be for security purposes; however he

---

[9] Jankee's expert expressed numerous other opinions on the failure of the contractors to meet the standard of care, but we relate only those that concern the alleged defects in the window through which Jankee escaped and that may be relevant to the manner in which he escaped. Although the complaint alleged negligent construction of the windows against HGA and Cullen and negligent manufacture of the windows and failure to warn against MILCO, Jankee's briefs and his expert's testimony focuses on the selection and design of the windows and hardware—the feature of operability, the lack of security screens, the cube stops and the channel stops. He does not develop arguments to support claims of negligence against the contractors in construction, manufacturing or failure to warn, and we therefore do not address these claims.

[10] It is not clear from Young's testimony whether he was referring only to the cube stop when he mentioned the potential for a wider opening at the bottom, or the channel stop as well. Because we are reviewing a summary judgment against Jankee, we have viewed Young's testimony in the light most favorable to Jankee.

recognized that a manual he considered authoritative said the maximum allowable for security purposes was four-and-one-half inches and he did have an opinion that if an opening was no wider than three inches, that would not be a security risk.

We first consider that the windows can be opened and have only insect screens, no security screens or bars. As to these features, we conclude that the undisputed facts show the *Lyons* test is met. These features were chosen by CCHCC personnel. The balancing of therapeutic, security and cost concerns fits squarely within the discretionary decisions that governmental units are authorized to make.[11] *See Lyons*, 207 Wis. 2d at 453, 558 N.W.2d at 661. The specifications approved by the County described a very particular type of window containing these features and the County approved the features after considerable discussion. The windows provided were precisely the MILCO W–21T windows specified. Finally, there is no evidence that any of the contractors were aware of any danger that the County was not aware of in having windows that open in the CMI unit with insect screens. Indeed, it is undisputed that CCHCC personnel knew there was a security risk anytime a window opened, but decided there were countervailing concerns.

Jankee argues that these design features—that the windows can be opened and have insect screens but no bars or security screens—are too general to meet the first part of the *Lyons* test, because many different

---

[11] The parties do not discuss the interplay between applying the government contractor immunity doctrine and the safe place claim against the County. Therefore we do not address this issue. *See Waushara County v. Graf*, 166 Wis. 2d 442, 451, 480 N.W.2d 16, 19 (1991) (we generally do not consider issues not specifically raised on appeal).

types of windows could satisfy these features. However, the purpose of the first part of the test, besides ensuring that the challenged decision is within the class of official decisions that should be insulated from judicial scrutiny, is to make sure that the governmental unit has actually exercised its discretion by reflecting on the design feature at issue. *See Lyons*, 207 Wis. 2d at 457, 558 N.W.2d at 663. Based on the undisputed evidence, the County did reflect on these features. Moreover, although Jankee suggests in his reply brief that another type of window could have satisfied these requirements by the County and still have been more secure, the only alternative window he mentions is one with a security screen. Mills testified that he did not want security screens, and there is no evidence controverting that.

With regard to the selection and design of the cube stop as the means to both limit the opening of the window and lock the window, Mills' testimony was that, although the need for a device to limit the opening was discussed with HGA, he was not involved in the selection or design of the cube stop, did not review the specifications or drawings, and did not even know of the device selected to perform this function until 1984 when he learned a patient had managed to pry one loose. However, it is undisputed that at that time Mills learned that cube stops had been installed, how they functioned, and that they could be manipulated and removed by patients. Courts in other jurisdictions have held that the application of the *Boyle* test is not limited to the design phase and may be applied at later stages, prior to the accident, when the governmental unit makes decisions about replacement, modification or continued use of a product in response to problems discovered in the use of the product. *See Lewis v.*

*Babcock Indus., Inc.*, 985 F.2d 83, 87–90 (2nd Cir. 1993), and cases discussed therein. We conclude this approach is proper here, and we therefore examine the response of the County after Mills learned of the problem with the cube stop.

It is undisputed that the County continued to use the cube stop in the regular CMI unit, because Jankee removed one from the window he escaped through. It is not clear on this record whether the stop was being used to make the opening less than five inches, to lock the window closed, or was simply duplicating the function of the channel stop. However, if the County did continue to use cube stops to keep patients from escaping, it did so knowing that patients could manipulate and remove them. Continued use of a product after the governmental unit has had experience with the potential design problem constitutes approval of reasonably precise specifications. *Ramey v. Martin-Baker Aircraft Co., Ltd.*, 874 F.2d 946, 950–51 (4th Cir. 1989). Under those circumstances, the contractor is immune from liability for damages caused by that design feature if the contractor does not have more information than the governmental unit about the dangers of that feature. *Id.* Once Mills knew that the cube stop could be manipulated and removed by patients, he knew at least as much as the contractors about that particular danger, and there is no evidence that any of the contractors had information about other dangers unknown to the County.

Our analysis of the alleged defects in the channel stop is similar. Although there may be disputed facts concerning whether the first part of the *Lyons* test was met at the time the County approved the change order for the channel stops, it is undisputed that in 1987 Mills learned that a patient unscrewed a channel stop

and climbed out of a window. After an investigation, Mills made the decision to continue to use the channel stops, unmodified. The only reasonable inference from the evidence is that Mills knew that the channel stop was attached to the top channel by screws which could be unscrewed, and that there was no channel stop on the bottom sill. The decision to continue to use the channel stops as originally designed and installed with this knowledge constitutes approval of reasonably precise specifications. *See Ramey*, 874 F.2d at 951. There is no evidence that any of the contractors had knowledge of security risks with regard to the channel stops that the County did not know of. Jankee may be suggesting that one or more of the contractors should have known that with a channel stop in only the top track of the window, a patient could force the bottom of the window to open a little wider. However, the third part of the test is what the contractor actually knew, not what it should have known. *See Stone v. FWD Corp.*, 822 F. Supp. 1211, 1212 (D. Md. 1993); *see also Oliver*, 96 F.3d at 1001.

Jankee and the County argue that the channel stops installed by MILCO did not conform to the specifications because they permitted only a three-inch opening, and the County never approved that specification and at all times wanted a five-inch opening. Assuming for purposes of discussion that those are undisputed facts, they are of no consequence because at the time Jankee escaped, the channel stops had been modified to permit a five-inch opening as originally specified. It is also not relevant for purposes of the contractor immunity defense whether a County employee made that modification or one of the contractors, because, in either case, it was done to conform the channel stops to the originally specified five-inch

171

opening, which, the evidence shows and the County contends, is what the County wanted.[12] Assuming that Young's testimony would support a finding that the combined design features of a five-inch opening with a channel stop screwed into only the top channel departed from accepted design standards, there is no evidence that any of the contractors had knowledge of any danger with respect to those combined features that the County did not know about.

■

Based on the undisputed facts, we conclude HGA, Cullen and MILCO are entitled to judgment as a matter of law that they have met the test for government contractor immunity and the claims were therefore properly dismissed.

*Jankee's Contributory Negligence*

The trial court determined that, in assessing Jankee's contributory negligence for his injuries, his conduct must be judged by the standard of a reasonable person, and his mental incapacity could not be taken into account. Applying that standard, the court concluded, as a matter of law, the County was not more negligent than Jankee. The court relied, as does the County on appeal, on two recent supreme court decisions, *Gould v. American Family Mut. Ins. Co.*, 198 Wis. 2d 450, 543 N.W.2d 282 (1996), and *Burch v.*

---

[12] Mills avers in his supplemental affidavit that the change order approved by the County did not change the specification regarding the five-inch opening; the County did not know that the channel stops did not conform to this specification until November 1984; and, while the County then expected that Cullen would alter the channel stops to conform to the five-inch opening, it was not important to the County who did that as long as it was done.

*American Family Mut. Ins. Co.*, 198 Wis. 2d 465, 543 N.W.2d 277 (1996). Jankee argues that neither decision precludes consideration of his mental incapacity in determining whether he was contributorily negligent. He points to the opinion of Dr. Melvin J. Soo Hoo that his escape was an impulsive act, caused by his permanent mental disability, bipolar affective disorder, which prevented him from controlling or appreciating his conduct. Jankee argues that this and similar testimony precludes summary judgment in favor of the County.

We agree with Jankee that neither *Gould* nor *Burch* forecloses his position, and we also conclude that the reasoning of the court in *Gould* supports his position.

In *Gould*, a patient at St. Croix Health Care Center who had been diagnosed with Alzheimer's disease injured the head nurse of the dementia unit. The court concluded that, while under Wisconsin law a mentally disabled person is ordinarily responsible for his or her torts, a person institutionalized with a mental disability who does not have the capacity to control or appreciate his or her conduct cannot be liable for injuries to caretakers who are employed for financial compensation. *Gould*, 198 Wis. 2d at 462–63, 543 N.W.2d at 287. In reaching this conclusion, the court reviewed the policy reasons behind the general rule imposing liability on the mentally incapacitated and concluded those reasons were not applicable in the circumstances before it. *Id.* First, the rationale that where a loss must be borne by one of two innocent persons, it should be borne by the one who occasioned it did not apply. Gould was not an innocent member of the public unable to understand or safeguard against the harm, but rather was employed as a caretaker

specifically for dementia patients and knowingly encountered the dangers of such employment.

> Holding [the patient] negligent under these circumstances places too great a burden on him because his disorientation and potential for violence is the very reason he was institutionalized and needed the aid of employed caretakers.

*Id.* at 462, 543 N.W.2d at 287.

The *Gould* court also decided that the second rationale—holding mentally incapacitated persons liable for their torts will induce family members to restrain them—did not apply because the patient's relatives had already placed him in a secured setting: "When a mentally disabled person is placed in a nursing home, long-term care facility, health care center, or similar restrictive institution for the mentally disabled, [family members] are not likely in need of such further inducement." *Id.* at 462, 543 N.W.2d at 287. Finally, the court held that the rationale of preventing tortfeasors from pretending mental incapacity to defend wrongful acts did not apply because it was incredible that someone would feign mental illness and subject themselves to commitment in an institution in order to avoid future civil liability. *Id.* at 462–63, 543 N.W.2d at 287.

*Burch* was decided the same day as *Gould*. In *Burch*, a father was injured when his daughter, who had cerebral palsy, turned the ignition key, causing the truck to strike her father. *Burch*, 198 Wis. 2d at 469, 543 N.W.2d at 278–79. The court reaffirmed the general rule that a tortfeasor's mental incapacity cannot bar civil liability for negligence, and emphasized that *Gould* carved out a "very narrow exception" to that rule. *Id.* at 473, 543 N.W.2d at 280. Because the daugh-

ter did not come within the *Gould* exception, the court decided that she should be held to the reasonable person standard of care. *Id.*

Both *Gould* and *Burch* dealt with the liability of tortfeasors, rather than the contributory negligence of an injured plaintiff. That is a significant distinction because it affects the application of at least one of the rationales for the general rule, as discussed in *Gould*. In addition, *Burch* did not involve a person institutionalized because of a mental incapacity, or the alleged negligence of the institution. While *Burch* provides little guidance, we conclude that the policy reasons discussed in *Gould* provide the appropriate starting point for resolving the issue in this case. Setting aside for the moment the distinction between a tortfeasor's liability and an injured plaintiff's contributory negligence, we conclude that none of the rationales for the general rule support its application to Jankee.

First, Jankee is alleging that the institution where he was involuntarily confined precisely because of his mental illness, was negligent in supervising him and providing a safe environment for him. There is no dispute that the institution knew of his mental illness and knew of the potential for escape of a person in the CMI unit. Second, because Jankee was already confined in a locked unit, his family members did not need an inducement to restrain him. Third, it makes no sense to contend that Jankee feigned mental illness and subjected himself to involuntary confinement in order to put himself in a better position for a future lawsuit.

We do not agree with the County that *Breunig v. American Family Ins. Co.*, 45 Wis. 2d 536, 173 N.W.2d 619 (1970), supports its position. As the *Gould* court explained, *Breunig* created a limited exception to the general rule that a tortfeasor is liable for his or her

175

torts regardless of a mental incapacity, where the person is overcome without forewarning by a mental disability or disorder that incapacitates him or her from conforming conduct to a reasonable person under like circumstances. *Gould*, 198 Wis. 2d at 458, 543 N.W.2d at 285. The *Gould* court declined to read *Breunig* so broadly as to bar liability in all cases where a mental disability prevents a person from controlling or conforming conduct, but went on to fashion an exception for the circumstances before it, as we have discussed above. *Gould*, 198 Wis. 2d at 458, 543 N.W.2d at 285. We consider the policy factors discussed in *Gould* and the factual similarities between this case and *Gould* to provide more guidance than *Breunig*.

Focusing now on the contributory negligence context of this case, we conclude that this also favors Jankee's position. Jankee has not injured anyone else. The County here is not only "not innocent" like the nurse in *Gould*, in that the County knew of Jankee's mental illness and was charged with caring for him precisely because of it, but it is also "not innocent" in that Jankee alleges that the County's negligence caused his injuries.

Generally a person has a duty to exercise ordinary care for his or her own safety. *See Johnson v. Grzadzielewski*, 159 Wis. 2d 601, 608, 465 N.W.2d 503, 506 (Ct. App. 1990). The County relies on *Johnson*, in which we held that a plaintiff's contributory negligence was greater, as a matter of law, than any negligence of the defendants. *Id.* at 609, 465 N.W.2d at 506. The plaintiff in *Johnson* was "express riding" an elevator and then tried to climb up through the space between the elevator car and the walls of the shaft when the car stopped between two floors. We reasoned that the plaintiff's acts were a dangerous and intentional mis-

use of the elevator. *Id.* at 608, 465 N.W.2d at 506. However, there was no contention in *Johnson* that the plaintiff's dangerous acts were not volitional because of a mental illness or incapacity. *Johnson* therefore does not provide a basis on which to reject Jankee's position.

More instructive is *Wright v. Mercy Hosp.*, 206 Wis. 2d 449, 463–64, 557 N.W.2d 846, 852 (Ct. App. 1996). There we held that the court properly denied a request for an instruction on contributory negligence in a claim of medical malpractice for negligent psychiatric treatment arising out of a relationship that developed between the patient and her care provider. On appeal, the hospital argued that, under *Burch*, a mentally ill person is held to the same standard of care as the average person. We rejected that argument and concluded that *Gould* supported the trial court's decision. *Id.* We recognize that Jankee's claim against the County is not a malpractice claim, and therefore *Wright* is not directly on point. However, it does illustrate one application of *Gould* to the contributory negligence of a psychiatric patient in a suit against the health care facility.

We conclude that *Gould* supports a bar to contributory negligence when a person institutionalized with a mental illness or mental disability who does not have the capacity to control or appreciate his or her conduct because of that illness or disability claims that the institution or its employees were negligent. However, we also conclude that there are genuine factual disputes on this record whether Jankee's condition at the time he made the escape meets this test. Some of his deposition testimony would support a finding that he did appreciate and control his conduct at that time; while other testimony of Jankee and of Dr. Soo Hoo,

177

drawing all reasonable inferences in Jankee's favor, would support a finding that he did not. If Jankee did not have the capacity to control or appreciate his conduct because of his mental illness or disability, the jury may not consider contributory negligence. If he did, any evidence of contributory negligence on his part is considered under the standards generally applicable to contributory negligence.

## CONCLUSION

In summary, we conclude that the trial court properly dismissed HGA, Cullen and MILCO on the ground of government contractor immunity because there are no factual disputes on this record pertinent to the application of that doctrine. HGA, Cullen and MILCO are therefore entitled to judgment as a matter of law under that doctrine. With respect to the County, we conclude that there are material factual issues concerning whether Jankee had the capacity to control or appreciate his conduct at the time of his escape and therefore the trial court erred in dismissing the County.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded.