The Estate of Theresa E. Lyons and William Lyons, Plaintiffs-Appellants-Cross Respondents, †

Illinois Department of Public Aid, Plaintiff,

v.

CNA Insurance Companies and Strand Associates, Inc., Defendants-Respondents-Cross Appellants,

Donna K. Waller, Defendant.

Court of Appeals

*No. 95–3372. Submitted on briefs November 10, 1996.—Decided December 11, 1996.*

(Also reported in 558 N.W.2d 658.)

†Petition to review denied.

447

On behalf of the plaintiffs-appellants-cross respondents, the cause was submitted on the briefs of *Carl W. Chesshir* of *Cameron & Penegor, S.C.*, of Brookfield.

On behalf of the defendants-respondents-cross appellants, the cause was submitted on the briefs of *W. Wayne Siesennop* and *Jeffrey L. Janik* of *Godfrey, Braun & Hayes* of Milwaukee.

On behalf of the Wisconsin Department of Transportation, there was a brief filed by *James E. Doyle*, attorney general, and *Charles D. Hoornstra*, assistant attorney general.

Before Anderson, P.J., Brown and Snyder, JJ.

BROWN, J. Strand Associates, Inc., a professional engineering firm, is accused of having negligently designed a highway bridge in the town of East Troy. Strand contends, however, that the state Department of Transportation (DOT) directed it to implement the allegedly faulty aspects of the bridge design and therefore argues that it should be entitled to immunity against claims arising out of this design choice. Although no Wisconsin case has extended governmental immunity to private parties who act under directives from state agencies, we adopt the reasoning of other jurisdictions which have. We hold that Strand is entitled to immunity and affirm the order granting summary judgment in its favor.[1]

## BACKGROUND

Theresa E. Lyons sustained fatal injuries in February 1992 when her car was struck by another driver. The accident occurred at the intersection of Highway ES and Beach Road in the town of East Troy.

[1] Because we hold that the trial court properly dismissed the claims against Strand, we need not address Strand's cross-appeal in which it alleges an alternative ground for dismissing the claims against it. Here, Strand contends that it is a governmental "agent" for the purposes of § 893.82, STATS., which requires parties making claims against such an "agent" to follow certain procedures. Because the plaintiffs did not allegedly comply with these procedures, Strand contends that the suit should be dismissed. We do not reach *that* issue. However, we do discuss agency as it relates to a completely different issue. Within our discussion of whether Strand was a governmental agent *for immunity purposes*, we address its related argument that it is an "agent" under § 893.80(4), STATS., the municipal immunity statute.

Beach Road passes over a railway bridge just before the ES intersection. The driver who hit Lyons was passing over the bridge and missed the stop sign at the ES intersection.

Lyons' widower and her estate, which we refer to collectively as the Estate, subsequently brought claims against the other driver, the government and private authorities who were involved in the construction and maintenance of the bridge and Strand, the designer.[2] The circuit court later dismissed the claims against all of these defendants except for the driver. We now address the Estate's contention that the circuit court erred when it dismissed the claims against Strand.

The Estate believes that Strand negligently designed the bridge. It specifically contends that the "vertical curve" of the bridge is too high and thus limits the distance at which drivers passing over the bridge toward the ES intersection can first see the stop sign at the ES intersection. As Strand explains in its brief, "vertical curve" is a term used to describe the curvature of an engineered hill.[3] Generally, a hill with a high vertical curve has a steeper incline and is shorter in length; a hill with a low vertical curve is comparatively flatter and longer in length.

Furthermore, through discovery, the Estate learned that although the bridge was initially designed at a length of 150 feet and a relatively low vertical curve, the length was eventually set at 70 feet and a higher curve. Finally, the Estate's expert states that the shorter and higher design which Strand implemented did not conform to safety standards

---

[2] Strand's insurer, CNA Insurance Companies, was also named as a party.

[3] The term is sometimes spelled "verticle curve."

450

promulgated by the American Association of State Highway and Transportation Officials (AASHTO).

Strand, and the DOT as amicus, responded that the decision to utilize a vertical curve greater than those recommended under AASHTO standards was actually made by a DOT designer. Strand realized during its analysis that the long and low design would require reconstruction of adjoining roadways, substantially increasing the overall cost of the project. It reported these findings to the DOT designer. The DOT thus approved the short and high design because it would save excavation and highway reconstruction costs and would also provide Beach Road drivers with greater visibility when approaching ES. Although Strand was retained by the town of East Troy, the bridge was being built with federal highway funds, and the DOT had to approve the final plans.

Accordingly, because the DOT directed Strand to implement the short and high design option, Strand moved for summary judgment on the grounds that it was entitled to immunity from the Estate's claim that the firm negligently designed the bridge. The circuit court agreed and dismissed the claims against Strand.

The Estate now appeals the order awarding summary judgment to Strand. It raises two general arguments. First, it contends that the circuit court erred as a matter of law when it found that a private entity could be entitled to governmental immunity. Second, it alternatively contends that if such immunity is available, the record does not conclusively answer whether the DOT directed Strand to implement the short and high design and that this issue can only be settled at a trial. We will address each argument in turn. We note that a few additional facts pertinent to

451

the resolution of the second issue will be set out in later paragraphs.

## GOVERNMENTAL IMMUNITY

██ We begin with Strand's argument, which the DOT joins, that it should be entitled to immunity against the Estate's negligence claim because it did not select the short and high bridge design, but rather was directed to use these parameters by a governmental authority. This issue presents a question of law which we decide independently of the trial court. *See Stann v. Waukesha County*, 161 Wis. 2d 808, 815, 468 N.W.2d 775, 778 (Ct. App. 1991).

While Strand and the DOT acknowledge that no Wisconsin case has extended governmental immunity to private entities who carry out governmental directives, they cite to this state's municipal governmental immunity statute, § 893.80(4), STATS., and case law from other jurisdictions which have extended immunity in similar circumstances and argue that we should adopt such a rule here.[4]

██ We will start our analysis with Wisconsin's municipal immunity statute. At the outset, we make

[4] We observe that in *C.L. v. Olson*, 143 Wis. 2d 701, 718 n.10, 422 N.W.2d 614, 620 (1988), the supreme court cautioned that "the analysis applied in other jurisdictions regarding immunity is unhelpful." In *C.L.*, however, the court was concerned with whether a state employee's conduct was of a "discretionary nature" and hence immunized, *see id.* at 711, 422 N.W.2d at 617, not the issue we face of whether a private entity working at the direction of the state is entitled to immunity. We conclude that the immunity analysis of other jurisdictions is relevant and helpful to this latter issue.

two important observations. Although this statute does not apply to state officers or employees, such as those who allegedly directed Strand to use the short and high design, the supreme court has concluded that the common law immunity which does apply to state officers or employees is essentially equal to the statutory immunity granted to municipal officers and employees. *See C.L. v. Olson,* 143 Wis. 2d 701, 716 n.9, 422 N.W.2d 614, 619 (1988). Moreover, the specific conduct which Strand claims should be immunized, bridge designing, is certainly a form of the discretionary decision making which the statute and the common law both immunize. *See id.* at 710-12, 422 N.W.2d at 617.

With these two observations in hand, we see that the language of the municipal immunity statute seems to apply to Strand. It plainly prohibits suits against a governmental body or any of its "officers, officials, *agents* or employes" because of acts done in the exercise of legislative or quasi-legislative functions. Section 893.80(4), STATS. (emphasis added).

Furthermore, the rationale for providing such immunity also supports extending it to independent contractors who act at the direction of a state or municipal authority. In *Gordon v. Milwaukee County,* 125 Wis. 2d 62, 65-66, 370 N.W.2d 803, 805 (Ct. App. 1985), we explained that the purpose of this discretionary immunity was to insulate legislative policy decisions from judicial examination. We reasoned that the tort process was an "inadequate crucible" for testing the merits of choices made in the political arena. *Id.* at 66, 370 N.W.2d at 805 (quoted source omitted).

Thus, the language of § 893.80(4), STATS., and the reasoning of *Gordon* demonstrate that the focus of our

inquiry should be whether Strand was simply acting as an "agent" of governmental authorities who had retained ultimate responsibility for these aspects of the bridge design. If this accurately describes the situation, then Strand should be immune, just as the state authorities would be, because this court would otherwise be placed in the position of having to examine the merits of what was really a political choice.

Other jurisdictions facing this issue have extended immunity to private parties for similar reasons. Indeed, Strand and the DOT rely heavily on *Boyle v. United Technologies Corp.*, 487 U.S. 500, 512-13 (1988), where the Supreme Court adopted a "government contractor defense" and held that it could bar the estate of a military helicopter pilot from suing the manufacturer for alleged design flaws if the challenged design choice was made by military officials. The Court was concerned that without such a defense, the Armed Forces' decisions regarding the design of military equipment, especially the trade off between safety and combat effectiveness, would be subject to second-guessing in tort suits. *See id.* at 511. To reach this conclusion, the Court turned to a federal statute, similar to Wisconsin's, which conferred immunity to federal agencies and employees against claims arising out of their discretionary functions. *See id.* (citing 28 U.S.C.A. § 2680(a) (West 1994)).

, Strand and the DOT also point us toward *Vanchieri v. New Jersey Sports and Exposition Auth.*, 514 A.2d 1323, 1326 (N.J. 1986). There, the court held that a statute conferring immunity to public entities and employees could extend to an independent contractor when that contractor is performing tasks in accordance with the government's plans and

specifications. The New Jersey Supreme Court offered two rationales for this rule. One, it was concerned that independent contractors, without such immunity, would simply pass the costs of their liability along to government, thereby eliminating the fiscal savings associated with governmental immunity. *See id.* Two, the court noted that it would be "fundamentally unfair" to make an independent contractor liable for injuries caused by a defective design when the governmental authority was responsible for developing the design. *See id.*

The *Vanchieri* court, however, faced a factual situation distinguishable from the case before us; the plaintiff claimed that a government-hired security agency had not properly controlled the crowd at a football game. *See id.* at 1325. The difference in the intellectual exercises involved with effective crowd management versus those associated with quality bridge design is obvious. Nonetheless, we have traced the subsequent treatment of the *Vanchieri* rule and observe that it has been applied in the more analogous context of building design and construction. *See Board of Educ. v. W.R. Grace Corp.*, 609 A.2d 92 (N.J. Super. Ct. Law Div. 1992).

Our review of these authorities demonstrates that there are strong reasons to join the above courts and extend the § 893.80(4), STATS., municipal immunity and the common law state immunity to contractors who act in accordance with directions given by these authorities.

The Estate contends, however, that an engineering firm should not be automatically cloaked with immunity because a state agency directs what the firm is to do. The Estate suggests that Strand had an independent duty to the public not to compromise on

the safety of a design. It buttresses this argument with a cite to *A.E. Inv. Corp. v. Link Builders, Inc.*, 62 Wis. 2d 479, 488, 214 N.W.2d 764, 769 (1974), where the supreme court rejected an architectural firm's claim that it only owed a duty to its client, reasoning that members of the profession had a separate and distinct "responsibility to the public welfare." So in circumstances such as this case, where the government-approved design contradicts generally accepted standards, the Estate concludes that a professional designer has a duty "to not proceed."

Nonetheless, close examination of the *Boyle* and New Jersey decisions explored above reveals that what appear to be mutually exclusive values of giving professional designers immunity and ensuring that these professionals not abdicate their responsibility to the public at large can be reconciled. In *Boyle*, the Supreme Court did not confer blanket immunity to governmental contractors. Instead, it set out a three-part test that only granted immunity to military equipment manufacturers when:

    (1)  the United States approved reasonably precise specifications;

    (2)  the equipment conformed to those specifications; and

    (3)  the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Boyle*, 487 U.S. at 512. And although the Supreme Court's concern about judicial involvement in military affairs might suggest that the above test has limited use in other contexts, the New Jersey Superior Court

adapted it to the building construction industry. *See Board of Educ.*, 609 A.2d at 110.

The Supreme Court explained in *Boyle* that this three-part test served two goals. We believe that both goals support extending this test to the engineering field. First, prongs one and two of the *Boyle* test ensure that the challenged design is within the class of official decisions that should be insulated from judicial scrutiny and that the design feature being challenged was actually reflected upon by a governmental official. *See Boyle*, 487 U.S. at 512. As important, the third prong alleviates the concern that the Estate raises—the risk that a governmental contractor will ignore its duty to the public and withhold information about dangers that the government might not know about. *See id.* By requiring the contractor who seeks immunity to show that it informed the government about hidden flaws, society is ensured that governmental officers and officials get all the information necessary to support a proper discretionary choice. *See id.* at 512-13.

In summary, we adopt a form of governmental contractor immunity applicable to parties who contract with municipal or state authorities and are directed to perform certain tasks under that contract. An independent professional contractor who follows official directives is an "agent" for the purposes of § 893.80(4), STATS., or is entitled to common law immunity when:

(1) the governmental authority approved reasonably precise specifications;

(2) the contractor's actions conformed to those specifications; and

(3) the contractor warned the supervising governmental authority about the possible dangers associated with those specifications that were known to the contractor but not to the governmental officials.

This three-part test will ensure that state and municipal government, and the public at large, is able to make the best use of professional design assistance, but that professional contractors are not unfairly burdened by lawsuits when they follow governmental directives.

### SUMMARY JUDGMENT

Having concluded that Strand might be entitled to immunity, we must now address whether the record so conclusively demonstrates that Strand meets the three-part standard we set out above that it is entitled to judgment as a matter of law. *See generally Preloznik v. City of Madison*, 113 Wis. 2d 112, 115-16, 334 N.W.2d 580, 582-83 (Ct. App. 1983). Although the circuit court already determined that Strand is so entitled to judgment, we owe no deference to this conclusion because we independently apply the summary judgment methodology. *See id.*

Our review of the record reveals several documents which support Strand's claim to immunity. First, a letter from a director at the DOT to Strand, dated May 23, 1979, describes how the DOT and Strand met for a "field review" and there discussed how to "eliminate the large fill area" which would be required if the long and low design were used. In this letter, the DOT also asked Strand to prepare cost estimates for various alternatives.

Next, the record contains a letter dated June 12, 1979, where Strand outlined two possible solutions. In this letter, a Strand engineer explained how:

> [t]he original selection of vertical design geometrics for Beach Road was based upon DOT Design Criteria for this class of Roadway. This design criteria normally requires a 40 mph design speed, but with the approach to the stop condition on CTH ES, we reduced the design speed on this approach to 20-25 mph and utilized a 150 ft vertical curve. Your letter suggests that we utilize a design speed and vertical curve even below our reduction and we are in agreement that a further exception to the general design criteria is warranted in this instance. We have therefore revised the vertical profile to utilize a 70 ft vertical curve . . . .

Thus far, these two letters demonstrate that Strand and the DOT were working together on the development of the short and high design option and, more importantly, that Strand was waiting for the DOT's final approval of this aspect of the bridge design.

The supervisory character of the DOT is further revealed in a June 20, 1979, letter where the DOT informed Strand that it had reviewed the options that Strand proposed and directed Strand to "please proceed" with the profile for a 70-foot bridge with its higher vertical curve. This letter is followed a month later by another where Strand wrote to the DOT confirming that: "[t]he revised vertical profile for Beach Road is in accord with the result of our May 23 field review and your June 20 approval of the vertical profile revision using exceptions to the design standards."

Even though this series of letters undoubtedly points to the conclusion that Strand implemented the

459

short and high design at the DOT's direction, the Estate nonetheless maintains that a dispute of material facts remains.

The Estate argues that "[a] reasonable inference can be drawn that no directive' was ever given." While we acknowledge that no single document contains a bald command to Strand directing it to "design this bridge with a 70 foot curve,!" the whole series of correspondence certainly supports that conclusion. Indeed, we are unable to discern what other possible (and reasonable) inference could be drawn from these letters. Since the Estate does not contest the verity of these letters, *see Kosmatka v. DNR*, 77 Wis. 2d 558, 564, 253 N.W.2d 887, 890-91 (1977), we conclude that Strand is entitled to summary judgment.

The Estate also argues that the above correspondence does not entitle Strand to judgment because Strand had a duty as a professional engineer to "disagree with suggestions from the Department of Transportation and to insist that the design of the bridge meet necessary safety requirements." But this contention is an allegation of law which cannot be used to defeat a motion for summary judgment. *See Krieg v. Dayton-Hudson Corp.*, 104 Wis. 2d 455, 465, 311 N.W.2d 641, 646 (1981). And as we explained above, the legal standard appropriate to this case only requires that a professional engineer warn the supervising state officials about any possible dangers that are otherwise unknown to the state. In these letters, Strand repeatedly stated that the 70-foot design curve was an exception to the current standards. This was sufficient to fulfill its obligation to inform the DOT about possible concerns with the short and high design.

In sum, we hold that the record conclusively demonstrates that Strand is entitled to immunity against the Estate's claim. No issue remains for trial. First, the correspondence outlined above demonstrates how the DOT approved the 70-foot design, a reasonably precise standard. Next, the record contains no dispute that the bridge was ultimately designed and constructed pursuant to this 70-foot design. Finally, the exchange of letters demonstrates that Strand and its DOT supervisors were aware that this design was outside accepted standards, but that the DOT nonetheless directed Strand to implement it because of site conditions.

*By the Court.*—Order affirmed; cross-appeal dismissed.