Showers Appraisals, LLC, Real Marketing, LLC
and Mark W. Showers, Plaintiffs-Appellants,†

v.

Musson Bros., Inc. and
West Bend Mutual Insurance Company,
Defendants-Respondents-Cross-Appellants,

League of Wisconsin Municipalities
Mutual Insurance and City of Oshkosh,
Defendants-Cross-Respondents.

Court of Appeals

*No. 2011AP1158. Oral argument February 28, 2012.
—Decided June 27, 2012.*

2012 WI App 80

(Also reported in 819 N.W.2d 316.)

† Petition for Review granted 11/14/12.

623

624

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of and oral argument by *Daniel J. Posanski* of *Dempsey Law Firm, LLP*, of Oshkosh.

On behalf of the defendants-respondents-cross-appellants, the cause was submitted on the briefs of *David G. Dudas* and *Joseph P. Putzstuck* of *Mccanna, Dudas & Kewley, S.C.*, of Appleton. There was oral argument by *David G. Dudas*.

On behalf of the defendants-cross-respondents, the cause was submitted on the brief of *Richard J. Carlson* of *Silton Seifert Carlson, S.C.*, of Appleton. There was oral argument by *Bree A. Madison of Silton Seifert Carlson, S.C.*, of Appleton

Before Brown, C.J., Neubauer, P.J., Reilly, J.

¶ 1. BROWN, C.J. This case arises from the June 2008 floods in Oshkosh. Mark Showers and his businesses, Showers Appraisals, LLC, and Real Marketing, LLC, sued Musson Bros., Inc. and the City of Oshkosh for damages suffered in those floods. At the time of the storm, Musson was working as a private contractor for the State of Wisconsin to replace the storm sewer in front of Showers' building. Musson claimed, and the trial court agreed, that it is entitled to governmental immunity under *Estate of Lyons v. CNA Ins. Cos.*, 207 Wis. 2d 446, 457–58, 558 N.W.2d 658 (Ct. App. 1996), a case extending governmental immunity to independent contractors when certain conditions are met. Showers appeals as to Musson, and his primary argument is that because Musson was afforded some discretion in its implementation of contract provisions, *Lyons* should not shield it from liability. We disagree—*Lyons* and its progeny confirm that some discretion on the part of an independent contractor does not, in and of itself, destroy governmental immunity under *Lyons*. We affirm the trial court's grant of summary judgment in favor of Musson, and because of that, we need not address Musson's cross-appeal against the City.

## BACKGROUND

¶ 2. We begin with an overview of the magnitude of the June 2008 storms in Oshkosh.[1] On June 8, 2008, Oshkosh received heavy rains, which the Oshkosh

---

[1] In his reply brief, Showers asserts that Musson did not raise the June 2008 rains as an affirmative defense in its answer to the complaint. He claims that "[s]ince Musson does not make a concise reference to these defenses, as a matter of law, the court must bar Musson's arguments regarding storm sewer drainage capacity in Oshkosh, 75–year event, and Acts of God." We disagree with that contention. Musson listed, as an affirma-

assistant director of public works described as a "25–year rainfall and flooding." Four days later, on June 12, 2008, Oshkosh received 4.36 inches of rain over a period of six hours, or the equivalent of a seventy-five-year rain event. This case involves the flooding of Showers' businesses during the June 12 rains. A map of flooding in Oshkosh that day indicates that many of Oshkosh's streets were flooded as a result of the rains on June 12. The Oshkosh assistant director of public works explained that "[t]he City received complaints and reports of street and basement flooding ranging from where streets, storm sewer and sanitary sewer facilities had been recently constructed to where storm sewers and sanitary sewers were over 100 years old." That is the situation that forms the backdrop of Showers' negligence complaint.

¶ 3. Next, we outline the relationships between Musson, the department of transportation (DOT) and the City regarding the construction project that was in process outside Showers' property when the storms hit. Musson signed a "contract for highway work" on January 9, 2008, which was later approved by the governor of Wisconsin and a DOT representative. The contract was for a project to replace sanitary and sewer mains in an area that included Showers' property. Plans and specifications for the project were incorporated into the contract by the DOT. Musson was "solely responsible for the means, methods, techniques, sequences, and procedures of construction."

---

tive defense, that "[p]laintiffs' damages and losses, if any, are the result of . . . intervening acts and/or superseding causes." It then made reference to the rains in its motion for summary judgment and supporting affidavits. Showers has not explained why that is insufficient. Moreover, it would defy reason if we refused to acknowledge the magnitude of the storms. The significant event is, after all, the catalyst for what occurred.

¶ 4. Once work on the project began, Ryan Schan-hofer, a DOT engineer, was on site regularly and kept a daily log of issues related to the project. In addition, the DOT, Musson, and representatives of the City attended weekly meetings to discuss the project. Schanhofer's daily log shows that some disagreements arose between Musson, the City, and the DOT. The chief disagreement relevant to this appeal was regarding Musson's decision to disconnect the sewer for a large portion of the project all at once, rather than one or two blocks at a time. Musson's project manager, Mark Cornelius, testified that Musson decided to disconnect an entire road because on the first day of the project, the storm sewer had to be plugged at the river to prevent the river water from entering the project area via the storm sewer. So, according to Cornelius, whether the storm sewer was connected or not, pumps would have had to be used.

¶ 5. The City maintains that there was a prior unwritten understanding between the City, Musson and the DOT to go block-by-block. After the City discovered that Musson had disconnected a larger por-tion, it complained to the DOT, but was told that the decision was a means and methods decision within Musson's discretion. Ultimately, even with the decision to disconnect an entire road, Schanhofer and the DOT project manager assigned to the project testified that Musson met the contract specifications, particularly those related to drainage. Schanhofer additionally ex-plained that if there had been a problem with contract compliance and he was aware of it, he would have had the power and responsibility to intervene to ensure that the contractor came into compliance with the contract.

¶ 6. After the first wave of rain on June 8, 2008, and warnings of more to come, Musson worked with the City and the DOT to formulate a plan to handle the rain

that was still on its way. The City provided Musson with maps and suggested pump locations, but was not involved in implementing the plan. Mark Miller, a City water maintenance employee, testified that he saw pumps up and running, but he did not know how many. In addition, on June 12, Schanhofer wrote in his daily log that he and at least two other people were going from location to location to observe the pumps. He observed the pumps to be working in the morning, with some problems in the afternoon as the rain continued. Showers, however, submitted several affidavits of witnesses who could not remember seeing pumps near his property, and Schanhofer acknowledged that there was no pump outside of Showers' property on June 13, 2008.

¶ 7. Showers sued Musson and the City, alleging that his property was damaged as a result of their negligence on the project. The City and Musson each filed cross-claims against each other for indemnification, and they each filed motions for summary judgment against all of Showers' claims. The trial court granted summary judgment, reasoning that governmental immunity applied to both the City and Musson. Showers appeals as to Musson, and Musson has filed a cross-appeal against the City.

## DISCUSSION

█

¶ 8. Before we get into the specific issues raised by Showers, we will provide a brief overview of governmental immunity law that is relevant to this case. WISCONSIN STAT. § 893.80(4) (2009–10)[2] states, in pertinent part,

---

[2] All references to the Wisconsin Statutes are to the 2009–10 version unless otherwise noted.

No suit may be brought against any . . . governmental subdivision or any agency thereof for the intentional torts of its officers, officials, agents or employees nor may any suit be brought against such . . . subdivision or agency . . . or against its officers, officials, agents or employees for acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions.

In *Lyons*, we elaborated on the meaning of "agent" as used in § 893.80(4). *See Estate of Lyons*, 207 Wis. 2d at 457–58. We stated that an independent contractor who follows official directives is an agent entitled to governmental immunity when:

(1) the governmental authority approved reasonably precise specifications;

(2) the contractor's actions conformed to those specifications; and

(3) the contractor warned the supervising governmental authority about the possible dangers associated with those specifications that were known to the contractor but not to the governmental officials.

*Id.*

¶ 9. The analysis does not end even with a determination that the contractor is entitled to governmental immunity under *Lyons*. For example, our case law applying Wis. Stat. § 893.80(4) has differentiated between the government's discretionary acts and its ministerial duties. *Willow Creek Ranch, LLC v. Town of Shelby*, 2000 WI 56, ¶¶ 25–27, 235 Wis. 2d 409, 611 N.W.2d 693. Discretionary acts are protected by the statute, but ministerial duties are not. *Id.* A ministerial duty is defined as one that "is absolute, certain and imperative, involving merely the performance of a

specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion." *Caraher v. City of Menomonie*, 2002 WI App 184, ¶ 18, 256 Wis. 2d 605, 649 N.W.2d 344 (citing *Lister v. Board of Regents*, 72 Wis. 2d 282, 301, 240 N.W.2d 610 (1976)). In some cases, a known and compelling danger may give rise to a ministerial duty, when the danger is of such force that the public officer has no discretion not to act in a particular way. *See Lodl v. Progressive N. Ins. Co.*, 2002 WI 71, ¶¶ 43–45, 253 Wis. 2d 323, 646 N.W.2d 314.

¶ 10. In this appeal, Showers claims that Musson is not entitled to governmental immunity as an agent under *Lyons*, and that even if Musson meets the *Lyons* test, it is still not protected by governmental immunity because it had a ministerial duty to maintain drainage at the construction site, which it did not do. Alternatively, Showers argues that the June 8 rains created a situation where there was a known and compelling danger that gave rise to a ministerial duty. Thus, he argues that summary judgment should not have been granted as to Musson. Musson cross-appeals as to the City, arguing that if summary judgment is reversed as to Musson, it should be reversed as to the City as well. As we said at the outset, since we affirm summary judgment as to Musson, we need not address its cross-appeal.

■

¶ 11. We review summary judgments de novo, using the same methodology as the trial court. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of

law. Wɪꜱ. Sᴛᴀᴛ. § 802.08(2). Showers' main issues in this appeal relate to whether Wɪꜱ. Sᴛᴀᴛ. § 893.80(4) applies, which is a question of law that we review de novo. *See Estate of Brown v. Mathy Const. Co.*, 2008 WI App 114, ¶ 6, 313 Wis. 2d 497, 756 N.W.2d 417. Showers also contends that there are a few factual disputes, which we will address in the context of his other arguments.

*Independent contractor immunity—reasonably precise specifications*

¶ 12. We first address whether Musson meets the *Lyons* immunity test. Showers focuses primarily on the first two prongs of the *Lyons* test—whether there were reasonably precise specifications and whether Musson followed them.[3] In his brief, Showers actually conceded that the first *Lyons* prong was met since the contract contained reasonably precise specifications. However, at oral argument, he withdrew that concession, and we will not hold him to it.[4] As we understand Showers' argument regarding the first prong, the contract did not contain "reasonably precise specifications" because too much discretion was afforded to Musson as to how to meet some of the more general contract provisions.

---

[3] Showers also argues briefly that the third factor of the test set forth in *Estate of Lyons v. CNA Ins. Cos.*, 207 Wis. 2d 446, 457–58, 558 N.W.2d 658 (Ct. App. 1996) is not met. He states in a footnote that "[t]here is no evidence in the record that Musson warned any governmental authority about its concerns . . . regarding the DOT Specifications; therefore, Appellants will prevail on [that] prong of the *Lyons* test." However, he does not develop that argument, other than two paragraphs in his reply brief, so we need not address it. *See M.C.I., Inc. v. Elbin*, 146 Wis. 2d 239, 244–45, 430 N.W.2d 366 (Ct. App. 1988).

[4] We suspect Showers withdrew his concession because our notice of oral argument contained questions that cast the issues in a different light from the briefs.

That argument is based on the contract provision allowing Musson to use whatever "means and methods" it thought appropriate to meet those provisions. Therefore, Showers claims that Musson falls outside the *Lyons* criteria because it was too independent from the State to be classified as an "agent."

¶ 13. The contract provisions which Showers believes to be problematic are as follows:

(1) "The contractor is solely responsible for the means, methods, techniques, sequences, and procedures of construction."

(2) "Before suspending the work, take the necessary precautions to prevent damage to the project, prevent traffic accidents, and provide for normal drainage."

(3) "The contractor shall . . . [c]onduct operations and maintain the work so that adequate drainage is provided at all times."

(4) "If it is necessary in the prosecution of the work to interrupt existing surface drainage, sewers, or under drainage, provide temporary drainage until completing permanent drainage work."

(5) "If storing salvaged topsoil on the right-of-way during construction operations, stockpile it to preclude interference with or obstruction of surface drainage."

(6) "Preserve, protect and maintain all existing tile drains, sewers, and other subsurface drains, or parts thereof, that the engineer judges should continue in service without change."

(7) "If the contractor damages or interrupts services, the contractor shall notify the utility promptly."

(8) "Notify, in writing, all public and private property owners whose property interferes with the work. Advise them of the nature of the interference, and arrange with them for the disposition of the property."

(9) "Use every reasonable precaution to prevent damage to all property including . . . all underground structures including water or gas shut-off boxes, water meters, pipes, conduits, etc.; within or outside the right-of-way."

¶ 14. We begin by analyzing whether these provisions are "specifications" as that term is used in *Lyons*. One definition of "specification" is found in BLACK'S LAW DICTIONARY 1434 (8th ed. 2004): "[t]he act of making a detailed statement, esp[ecially] of the measurements, quality, materials, or other items to be provided under a contract." If we were to use this definition, it would auger in Showers' favor because it implies something more specific than the provisions at issue in this case. However, we did not use the term "specifications" in a vacuum when we wrote *Lyons*. Instead, we used a modifier to precede the word "specifications"—the term *"reasonably* precise." *Estate of Lyons*, 207 Wis. 2d at 457 (emphasis added). This shows that exact direction to the contractor is not the hallmark of a specification.

¶ 15. Indeed, some flexibility in contract specifications is necessary and even desirable. In construction, for example, not everything can be foreseen and put into a contract that will define exactly how a contractor must respond to every situation. Instead, the owner of the project outlines certain bottom-line expectations that the contractor must make sure to adhere to. Those expectations create a framework through which everyone can operate when unexpected situations—such as

the June 12 storm—make following the more detailed plan impossible or impractical. A "means and methods" clause like the one in Musson's contract gives the contractor the discretion to operate within those expectations as it pleases. But that discretion is of course limited by the contract provisions. In such situations, a contractor working for the government does not lose immunity simply because it has to make some decisions on its own when an unplanned event or emergency situation arises.

¶ 16. Based on *Lyons'* implicit recognition of the need for some flexibility in contract specifications, we think the definition in WEBSTER's more accurately captures what we said in *Lyons*. *See* WEBSTER's THIRD NEW INTERNATIONAL DICTIONARY 2187 (1993). A "specification" is "a detailed, precise, explicit presentation (as by enumeration, description, or working drawing) of something *or* a plan or proposal for something." *Id.* (emphasis added). And when we view specifications in the WEBSTER's sense of the term—as "a plan or proposal for something"—then there is no question that the contract provisions highlighted by Showers are indeed specifications.

■

¶ 17. Thus, the only remaining issue is whether the standard specifications were reasonably precise. On that point, we agree with Showers to this extent: if a contractor is given so much discretion that it is not acting as an agent of the State but as a free agent acting without direction from the government, the first prong of *Lyons* would not be met. But we disagree with the principle that just because the contractor has some discretion in how to meet a desired specification outlined in the contract, *Lyons* immunity is lost as to that decision.

¶ 18. As we have explained in the past, any argument that the government has to have specifically mandated the act that constitutes the alleged negligence—here, the disconnection of the storm sewer —"misses the mark." *Estate of Brown*, 313 Wis. 2d 497, ¶¶ 10–11. In *Bronfeld v. Pember Cos., Inc.*, 2010 WI App 150, ¶¶ 28–29, 330 Wis. 2d 123, 792 N.W.2d 222, we addressed an argument that the government did not truly require the contractor in that case to follow the specifications in the contract because the contract itself delegated too much responsibility for safety (and therefore too much discretion) to the contractor. We responded to that argument by emphasizing that "the safety provisions the [plaintiffs] cite do not change the fact that [the contractor] was contractually obligated to follow the specifications in the project manual and traffic control plan. By mandating that [the contractor] comply with these specifications, the City of River Falls curtailed [the contractor's] discretion." *Id.*, ¶ 29.

¶ 19. Based on the reasoning in *Bronfeld*, in a case such as this one, where the contractor and the government had to rely on general specifications because aspects of the more specific plan were not working, the focus of our inquiry is whether the government had genuine oversight of the project despite the contractor's apparent discretion. If the only specifications curtailing Musson's discretion in this case were the written specifications highlighted by Showers, Showers would have a much stronger argument. However, in addition to the written plans and specifications, the DOT was involved with the project on an ongoing basis with regular opportunities to give input and be involved in the decision-making process. And Schanhofer testified that if contract compliance had been at issue, he would have had to intervene. In addition to that testimony, the DOT's

637

standard specifications explicitly state that the project engineer—in this case, Schanhofer—had the authority "to reject defective material and to suspend all work being improperly performed."

■

¶ 20. In other words, the DOT always had the power and responsibility to intervene if compliance with the contract was at issue. In this case, the standard specifications that applied to Musson's allegedly negligent methods, combined with the DOT's oversight of those methods, curtailed Musson's discretion. *See id.*, ¶¶ 28–29. It is that combination that convinces us that Musson was subject to reasonably precise specifications that satisfy the first prong of *Lyons*.

*Independent contractor immunity—conformity with the government's reasonably precise specifications*

■

¶ 21. Showers spent the bulk of his brief addressing whether Musson met the DOT standard specifications we enumerated above. Much of Showers' argument on this issue involves general provisions—for example, to provide "adequate" drainage at all times, take "necessary" precautions to prevent damage and provide for "normal" drainage, and use "reasonable" precautions to prevent damage to property.[5] Showers contends that his

---

[5] More specifically, we are referring to the following specifications: (1) Conduct operations and maintain the work so that adequate drainage is provided at all times; (2) Take the necessary precautions to prevent damage to the project, prevent traffic accidents, and provide for normal drainage; (3) Use every reasonable precaution to prevent damage to all property including all underground structures including water or gas shut-off

expert's affidavit establishes a genuine issue of material fact as to whether these general provisions were met, but we disagree. Showers' expert's opinion amounts to a criticism of how Musson and the City handled the storm, along with some explanations of techniques that might have worked better and allegations that Musson did not meet industry standards with regard to the project. The problem with that hindsight analysis is that it presumes that the DOT's standard specifications obligated Musson to achieve the desired outcomes outlined in the DOT's standard specifications during a seventy-five-year rain event.

¶ 22. Our analysis of whether Musson met the DOT's reasonably precise specifications is framed by the purpose of that prong of the *Lyons* test—to "ensure that the challenged design is within the class of official

boxes, water meters, pipes, conduits, etc., within or outside of the right-of-way; (4) Preserve, protect and maintain all existing tile drains, sewers, and other subsurface drains, or parts thereof, that the engineer judges should continue in service without change; and (5) If storing salvaged topsoil on the right-of-way during construction operations, stockpile it to preclude interference with or obstruction of surface drainage.

Of those, only the fifth—regarding stockpiling salvaged topsoil to preclude interference with surface drainage—is arguably concrete enough to lend itself to outside expert testimony that it was objectively not met. On that point, Showers' expert referred to a photograph taken June 13, 2008, and stated that "if it was [Musson's] intention to pump the water along Ohio Street for purposes of drainage . . . those piles will clearly stop the flow of water." However, the relevance of that opinion to determine whether the specification was met is premised on the assumption that to be successful, Musson had to stockpile any topsoil to preclude interference with drainage from the seventy-five-year rain that occurred on June 12. We simply do not believe that is the case, as we explain in the body of the opinion.

639

decisions that should be insulated from judicial scrutiny and that the design feature being challenged was actually reflected upon by a governmental official." *Estate of Lyons*, 207 Wis. 2d at 456–58. In other words, instead of focusing on whether Musson could have achieved better outcomes using different methods—which goes to its negligence—we must focus on whether it was following the reasonably precise specifications of the DOT when the alleged negligence occurred. *See Lodl*, 253 Wis. 2d 323, ¶ 17 (when analyzing an immunity defense, we assume negligence and focus instead on whether the action upon which liability is premised is entitled to immunity under the statute). And as with the first prong of the *Lyons* test, that analysis includes not only the written plans for the project, but the ongoing supervision and adjustments to those plans during the project. If Musson was following the DOT's plan at the time of the alleged negligence, as opposed to disregarding the DOT's instructions or acting without DOT oversight, then *Lyons* makes it immune from any negligence that resulted from following the plan.

¶ 23. Thus, we again look to the DOT's level of ongoing oversight and involvement in dealing with an evolving situation. The bottom line is that the DOT was regularly on site and kept a close eye on Musson's activities. Both Schanhofer and the DOT project manager, as well as Musson's own project manager, stated under oath that the contract specifications, including the maintenance of adequate drainage and other provisions cited by Showers, were followed. Showers' expert does not counter that testimony and therefore does not create a genuine issue of material fact as to whether the reasonably precise specifications were followed.

¶ 24. Showers next argues that affidavits from people who were near his property on June 12 stating

that they saw no pumps that day create a genuine issue of material fact as to whether adequate drainage was maintained according to the contract. We are not persuaded. No one has cited to the contingency plan that was in place for June 12 in the record, and we could not locate it. Because of that, we do not know where pumps should have been on that day relative to Showers' property. What we do know is that Schanhofer wrote in his daily log that he and others were at the project site on June 12 ensuring that pumping was happening according to the contingency plan. The fact that some witnesses who were not aware of the details of the contingency plan did not notice pumps in a particular location that day does not demonstrate that pumps were not where they should have been, or even that they may not have been there. The bottom line on this issue is that the contingency plan was made and implemented in concert with the DOT (and to some degree, the City), so *Lyons* applies.

¶ 25. Finally, Showers briefly alleges that there is a genuine issue of material fact as to whether block-by-block storm sewer disconnection was an agreed upon method of construction that became a reasonably precise specification Musson had to follow. We see no problem here. Although there is conflicting testimony as to whether the parties agreed at the beginning of the project to a block-by-block disconnection plan, it is undisputed that once Musson decided to do otherwise, the DOT stood by Musson's decision. It obviously did not believe Musson to be acting out of conformity with the contract because, not only did it not exercise its right to intercept such conduct, it told the City that the City had no power to act in this area.

¶ 26. We now move to the remaining, more concrete standard specifications that Showers alleges were

not met. First, he complains that Musson did not provide evidence that it had "notified the storm water utility that it disrupted the storm sewer and had no other means for drainage." We note up front that we have already concluded that Musson *did* provide alternative means for drainage through pumps. However, we also point out that the specification requiring notification of the utility provides that "[i]f the contractor damages or interrupts service, the contractor shall notify the utility promptly." It then goes on to state that the contractor should "[c]oordinate and cooperate with the utility in the repair of the facility" and that "[t]he department will determine who is responsible for repair costs." In context, it is clear that Musson was required to notify the utility if service was no longer being provided and Musson needed the utility's assistance to reconnect it. It is not clear that Musson had to notify the utility if service was merely altered in a controlled fashion, as it was here with the pumping plan.

¶ 27. Showers also contends that Musson failed to "[n]otify, in writing, all public and private property owners whose property interferes with the work [and to a]dvise them of the nature of the interference, and arrange with them for the disposition of the property." Showers argues that Musson failed to meet this specification when it did not notify Showers that the storm sewer servicing his property had been disconnected. We do not read this specification to require that action, however. There is no contention that Showers' property in any way interfered with the project such that the contractor needed to arrange for the disposition of his property in light of the interference. We do not see how this specification applies with regard to Showers' property.

*Discretionary act versus ministerial duty*

¶ 28. We next address Showers' claim that even if the *Lyons* test is met, Musson is not entitled to immunity because it had a ministerial duty to maintain a system of drainage, which is something it did not do. To support that argument, Showers relies on *Menick v. City of Menasha*, 200 Wis. 2d 737, 745, 547 N.W.2d 778 (Ct. App. 1996), which held that "while the decision to install and provide a sewer system in a community is a discretionary decision, there is no discretion as to maintaining the system so as not to cause injury to residents." Showers argues that *Menick*'s holding establishes Musson's ministerial duty to maintain the storm sewer in working order during construction.

¶ 29. *Menick* is totally inapplicable to this case. *Menick* explained how there was a difference between designing and building a public works system according to the design on the one hand, and maintaining the system once it was built. *Id.* Immunity is granted to the municipality for the former, but not the latter. *Id.* Since Musson was not involved in "maintaining" an existing system, but in building a new system, this is not a *Menick* case.

¶ 30. Lastly, we address Showers' related argument that the June 8 rains created a situation where there was a known and present danger that created a ministerial duty to act. In *Lodl*, our supreme court explained:

> To pierce immunity pursuant to this exception, we must be able to conclude that the circumstances were sufficiently dangerous so as to give rise to a ministerial

duty—not merely a generalized 'duty to act' in some unspecified way, but a duty to perform the particular act upon which liability is premised . . . .

*Lodl*, 253 Wis. 2d 323, ¶ 45. That is exactly what Showers cannot do. Although his argument that there was a known and present danger after the June 8 storm is persuasive, there is no evidence that the danger created a duty to act in a particular way. Musson, the DOT, and the City had the discretion to decide how to address the danger—which is why this exception does not apply to remove Musson's immunity pursuant to *Lyons*.

¶ 31. Because we affirm summary judgment and need not address the cross-appeal, costs may be allowed against Showers under WIS. STAT. RULE 809.25(1)(a).

*By the Court.*—Judgment affirmed.

¶ 32. REILLY, J. (*dissenting*). This case is not about rain that fell in June 2008. This case is about *Lyons* being expanded to provide blanket immunity to all government contractors. *Lyons* properly held that government contractors are entitled to immunity for "certain tasks" for which they were given "reasonably precise specifications"; i.e., where the contractor *lacks* discretion in the performance of "certain tasks." *See Estate of Lyons*, 207 Wis. 2d at 457. The majority expands *Lyons* so as to grant immunity for the discretionary acts (the "means and methods" of performance) of government contractors.

¶ 33. Musson requested immunity. As noted by the majority, case law dictates that when a party seeks immunity we assume for purposes of summary judgment that the party seeking immunity was negligent. *See* Majority op., ¶ 22. Musson bid and was awarded a $4.3 million contract to reconstruct Wisconsin and Ohio

Streets in Oshkosh. The contract provided that if Musson failed in providing temporary drainage during the performance of the contract that Musson would "be responsible for any damages to property or injury to persons occurring through their own negligence." We start with the premise that Mark Showers incurred approximately $140,000 in damages due to the flooding of his property caused by the negligence of Musson.

¶ 34. The majority acknowledged that the State, the City of Oshkosh, and Musson all had an "unwritten understanding" that Musson would disconnect the storm sewer on a block-by-block basis. *Id.*, ¶ 5. Musson later decided to rip out the entire storm sewer all at once rather than the agreed upon block-by-block method. The DOT conceded that Musson had the right to change the method of construction, as it fell within the means and methods clause of the contract. *Id.* We also know that the State did not dictate how the storm sewer was to be removed, how many pumps Musson needed to have on hand, or where those pumps were to be located. Given that summary judgment was granted, we do not know why Musson deviated from the unwritten agreement regarding removal. Perhaps Musson saved costs by removing the entire storm sewer all at once. Musson may have decided to risk removal of the entire storm sewer against the risk that it might rain. Whatever the reason, Musson retained the contractual right—the means and methods—to gamble on the method of removal of the storm sewer. Musson remained, however, contractually obligated should its gamble fail. Until now.

¶ 35. I suspect the rationale for expanding immunity to the discretionary acts of government contractors is to obtain the lowest possible bids from contractors bidding for public works projects. The temporary bargain gained by lower bids from private contractors is

645

paid for by Mark Showers and other good and virtuous citizens who will have to "take one for the team" and solely pay for the negligence of the government's agent. Granting blanket immunity to government agents for their discretionary acts will encourage private contractors to base their bids upon minimal conditions, as the contractor will know that if a rainy day comes, or if a mistake is made in the means and methods of performing the contract, or if the contractor simply decides to cut corners on quality, someone else will pay for the contractor's gambles and mistakes.

¶ 36. The policy question presented by this case is whether immunity for a private contractor's discretionary acts is wise. I believe it is poor public policy to insulate (through immunity) government contractors from sloppy, negligent work. Musson should not be entitled to immunity as Musson was not restricted in its performance of the contract by a government imposed obligation to perform a certain task according to reasonably precise specifications—the situation *Lyons* is meant to apply to. Quite the opposite, Musson is being granted immunity in this case because Musson alone decided how a certain task was to be performed. While the means and methods provision in the contract grants Musson the right to perform in the manner it choses, it also requires Musson to be responsible for damages caused by its negligent performance.

¶ 37. As I believe the majority has erred in its conclusion that discretionary acts of government contractors are entitled to immunity under *Lyons*, and as I believe the public policy of granting immunity to government contractors for their discretionary acts is counterproductive and will have severe and adverse consequences, I respectfully dissent. I would reverse and

remand to the circuit court for a trial on whether Musson was negligent and, if so, whether it was a cause of Showers' damages.