MICHAEL J. GABLEMAN, J.
¶ 1. We review an unpublished decision of the court of appeals that affirmed the Waukesha County circuit court's[1] grant of summary judgment in favor of Pro Electric Contractors ("Pro Electric"), after Pro Electric was sued for negligence in connection with its work as a contractor on a government construction project. Melchert v. Pro Electric Contractors, No. 2013AP2882, unpublished slip op. (Wis. Ct. App. Mar. 11, 2015).
¶ 2. Dr. Randall Melchert, Happy Hobby, Inc., and The Warren V. Jones and Joyce M. Jones Revocable Living Trust ("Petitioners") brought suit after *446 Pro Electric severed a sewer lateral[2] during an excavation, because the broken lateral caused flooding damage to property that Petitioners owned and occupied. Pro Electric moved for summary judgment, asserting immunity as a governmental contractor pursuant to Wis. Stat. § 893.80(4).[3] While Pro Electric admitted to severing the sewer lateral, it argued that the damage occurred because of construction design decisions made by the Wisconsin Department of Transportation ("DOT"), and that Pro Electric was merely implementing DOT's decisions. Following a hearing, the circuit court granted the motion and dismissed the case. The court of appeals affirmed.
¶ 3. This case requires us to address the extent to which governmental immunity protects a private contractor implementing a construction design chosen by a governmental entity. We hold that Pro Electric is immune from liability for severing the sewer lateral because it acted in accordance with reasonably precise design specifications adopted by a governmental entity *447 in the exercise of its legislative, quasi-legislative, judicial, or quasi-judicial functions.
f 4. This case also requires us to interpret and apply certain provisions of the Digger's Hotline statute, codified at Wis. Stat. § 182.0175. Petitioners allege that Pro Electric caused their damages not only by severing the sewer lateral, but also by backfilling the excavation without inspecting the sewer lateral for damage and allowing repairs to be made, as required by § 182.0175(2)(am)6.-6m.[4] Pro Electric is not immune from liability as to this second allegation, because DOT did not provide Pro Electric with reasonably precise specifications for inspecting sewer laterals for damage before backfilling pursuant to § 182.0175(2)(am)6.-6m. Ultimately, however, we affirm the circuit court's grant of summary judgment on the factual record before us. We do so because the undisputed material facts do not support a reasonable inference that Pro Electric failed to comply with its duties under § 182.0175(2)(am).
¶ 5. We begin with a brief factual background and description of the procedural history, and we next set forth the applicable principles of governmental contractor immunity. We apply these principles respectively to the two aspects of Pro Electric's conduct that allegedly caused Petitioners' damages: (1) Pro Electric's conduct in severing the sewer lateral, and (2) Pro *448 Electric's conduct in backfilling the excavation without inspecting the sewer lateral for damage and allowing repairs to be made, pursuant to Wis. Stat. § 182.0175(2)(am). Finally, we perform the necessary analysis to determine whether Pro Electric is entitled to summary judgment.
I. FACTUAL BACKGROUND
¶ 6. We have set forth the facts that appear in the record and which the parties do not dispute. On July 25, 2011, DOT approved a plan for the improvement of a five-mile stretch of State Highway 190, also known as Capitol Drive, in Brookfield ("Project Plan"). The Project Plan spanned over 1,000 pages and contained specifications and detailed diagrams for the installation of new asphalt pavement, curbs, gutters, sidewalks, and traffic signals. Additionally, the DOT Highway Work Proposal for the project included over 100 pages of "Special Provisions" covering the various aspects of the project, including a section on requirements regarding underground utilities.[5]
¶ 7. Following the bidding process, DOT awarded the project to Payne & Dolan as the general contractor. On January 5, 2012, Payne & Dolan entered into a subcontractor agreement[6] with Pro Elec- *449 trie to perforin work on certain parts of the project, including the installation of traffic signals. For some of the traffic signals, the Project Plan directed Pro Electric to install new concrete bases to support the traffic signal poles.
¶ 8. This case concerns only the installation of the concrete base identified in the Project Plan as "SB2," located at the northeast corner of Capitol Drive and 128th Street and identified by specific coordinates in the Project Plan.[7] The Project Plan directed Pro Electric to install a "Type 10" concrete base to support the traffic signal pole for SB2 and to use a circular auger to drill the hole in the ground for the base. The Project Plan specified that a Type 10 base required a hole that was 14 feet deep and 30 inches wide.
¶ 9. At least three days before Pro Electric started the excavation for SB2, Pro Electric contacted Digger's Hotline. The statute requires an excavator to contact Digger's Hotline at least three days before beginning any excavation.[8] Wis. Stat. § 182.0175(2)(am)l. Under *450 the statute, Digger's Hotline is then responsible for contacting the owners of transmission facilities[9] in the area, and the owners are responsible for ensuring that such facilities are marked. § 182.0175(1)(d)6., (2m)(a)2.[10] Pro Electric instructs its employees to inspect the area visually for these markings before beginning excavation.
¶ 10. Pro Electric's employees augered the hole for SB2 on August 22, 2012. Pro Electric used a circular auger attached to a truck at the end of a boom. Two of Pro Electric's employees performed the work: one was assigned to operate the auger from the truck and the other to monitor the auger and periodically clean it with a shovel. As Craig Clements, president of Pro Electric, stated in his affidavit, drilling a hole with a circular auger "creates a situation where *451 the technician operating the auger has no ability to see into the hole which is being augered."
¶ 11. DOT retained an engineering firm, HNTB, to ensure Pro Electric's compliance with the Project Plan, and an HNTB engineer, Julie Keller, was onsite to supervise the augering work. The DOT Project Plan warned that "there may be other utility installations within the project which are not shown" on the diagram, but in anticipation of a contractor encountering such unexpected utility installations, it further provided that "the engineer may adjust the locations of items under this contract to avoid conflict with existing utility facilities." Keller neither instructed nor authorized Pro Electric to change the location of SB2.[11] Nothing in the record suggests that either Pro Electric or Keller was aware, or had any reason to be aware, of any utility facilities in the way of the excavation for SB2. Pro Electric proceeded to complete the Type 10 concrete base in accordance with the specifications set forth in the DOT Project Plan.
¶ 12. At some point after the project was completed, sewage backed up into an adjoining commercial property. The property was owned by The Warren V. Jones and Joyce M. Jones Revocable Living Trust and occupied by Dr. Randall Melchert and Happy Hobby, Inc., as tenants. It was subsequently discovered that the sewer backup occurred because an underground sewer lateral serving Petitioners' property ran directly *452 through the location of SB2, such that Pro Electric had severed that lateral while constructing SB2. Nothing in the record suggests that either Pro Electric or HNTB was aware at the time of construction that Pro Electric had severed anything. The sewer lateral had been made of clay, and the surrounding soil was also clay, thus making it unlikely that indicia of the damage would have been apparent among the material the auger was bringing up.[12] Clements stated in his affidavit that "[n]o employee of Pro Electric ever reported to me, HNTB, or the general contractor that any sewer lateral was struck during the installation of SB2. All Pro Electric employees were instructed that any such incident would need to be reported immediately."
II. PROCEDURAL HISTORY
¶ 13. On March 1, 2013, Petitioners sued Pro Electric in the Waukesha County circuit court. Their complaint alleged that Pro Electric negligently severed the sewer lateral and then completed the project without repairing it. The complaint further alleged that, by doing so, Pro Electric thereby caused flooding and water damage to Petitioners' property, along with monetary losses, inconvenience, and other damages. In its answer, Pro Electric asserted immunity from suit as *453 a governmental contractor. The court held a summary-judgment hearing on Pro Electric's motion on November 18, 2013.
¶ 14. In an oral ruling following the hearing, the circuit court granted summary judgment in favor of Pro Electric, ruling that it was immune from liability. The court concluded that, "under any reasonable view of the evidence, DOT design choices regarding the location and the depth of the traffic light caused this accident here. Those relevant design choices were made by the government." The court did not consider whether the Digger's Hotline statute, Wis. Stat. § 182.0175, imposed additional duties on Pro Electric, because the court determined that the statute did not apply. Therefore, the circuit court granted summary judgment to Pro Electric and dismissed Petitioners' case.
¶ 15. The court of appeals affirmed, concluding that Pro Electric was immune from liability for any damages that resulted from severing the sewer lateral. The court of appeals determined that the "project design decision [oí] where and how to install the traffic light, as implemented by Pro Electric, is entitled to immunity under Wis. Stat. § 893.80(4) 'because it was made through the exercise of a legislative, quasi-legislative, judicial, or quasi-judicial function of the governmental entity.'" Melchert, unpublished slip op., ¶ 11 (quoting Showers Appraisals, LLC v. Musson Bros., 2013 WI 79, ¶ 34, 350 Wis. 2d 509, 835 N.W.2d 226). The court also examined Petitioners' allegation that Pro Electric was negligent in "backfilling the hole without repairing the severed sewer lateral," concluding that the record "does not support a causal connection between [Petitioners'] specific allegations of negligence . . . and the alleged injury." Id., ¶¶ 12-13.
*454 III. STANDARD OF REVIEW
¶ 16. We review a grant of summary judgment independently, using the same methodology as the circuit court. Oneida Cty. Dep't of Soc. Servs. v. Nicole W., 2007 WI 30, ¶ 8, 299 Wis. 2d 637, 728 N.W.2d 652. "The judgment sought shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Wis. Stat. § 802.08(2).
f 17. "We review questions of statutory interpretation and application independently, but benefiting from the discussions of the circuit court and the court of appeals." State v. Grunke, 2008 WI 82, ¶ 10, 311 Wis. 2d 439, 752 N.W.2d 769. "[D]etermining whether governmental immunity exists for particular conduct requires the application of legal standards to the facts found, which is also a question of law for our independent review." Showers, 350 Wis. 2d 509, ¶ 21.
IV. DISCUSSION
A. General Principles of Governmental Contractor Immunity
¶ 18. Our discussion begins with the longstanding principle that a governmental entity is immune from liability for acts done "in the exercise of its legislative or judicial or quasi-legislative or quasi-judicial functions." Holytz v. City of Milwaukee, 17 Wis. 2d 26, 40, 115 N.W.2d 618 (1962). The legislature has codified this principle in Wis. Stat. § 893.80(4). *455 Showers, 350 Wis. 2d 509, ¶ 24 (citing Coffey v. City of Milwaukee, 74 Wis. 2d 526, 532, 247 N.W.2d 132 (1976)). As we have recognized, immunity under § 893.80(4) "is available to a governmental entity only for those governmental decisions that are made as an exercise of 'legislative, quasi-legislative, judicial or quasi-judicial functions.'" Showers, 350 Wis. 2d 509, ¶ 35.[13] "Legislative and quasi-legislative functions generally refer to those policy choices made in an official capacity, e.g., when a governmental entity chooses one project design over another." Id., ¶ 26 (citing Estate of Lyons v. CNA Ins., 207 Wis. 2d 446, 453, 558 N.W.2d 658 (Ct. App. 1996)).
¶ 19. It is also well established that a governmental entity's immunity may extend to private contractors acting as agents of the governmental entity. Lyons, 207 Wis. 2d at 457-58. A contractor asserting governmental immunity must prove two elements. First, the contractor must show that it was an "agent" of the governmental entity under "the Lyons test, i.e., whether the governmental entity approved reasonably precise specifications that the governmental contractor adhered to when engaging in the conduct that caused the injury." Showers, 350 Wis. 2d 509, f 37.[14]
*456 ¶ 20. Second, "in addition to satisfying the Lyons test... a contractor asserting immunity must be able to demonstrate that the conduct for which immunity is sought was the implementing of a governmental entity's decision made during the exercise of the entity's legislative, quasi-legislative, judicial, or quasi-judicial functions." Id., ¶ 45. This is so because the contractor's immunity "is dependent upon the immunity of the governmental act or decision that the agent was implementing when it caused an injury." Id., ¶ 35. If that act or decision was made during the exercise of the governmental entity's legislative, quasi-legislative, judicial, or quasi-judicial functions, the governmental entity's immunity may extend to an agent implementing that act or decision. Id., ¶ 34.
f 21. For a private entity such as Pro Electric that is contracting with a governmental entity, this is where immunity ends. A contractor is not immune from liability if the governmental entity did not direct the injury-causing conduct with reasonable precision in the exercise of its legislative, quasi-legislative, judicial, or quasi-judicial functions. As we explained in Showers, the DOT contractor in that case was not immune from allegations of negligent construction work, in part because the contractor had not demonstrated that the allegedly negligent acts "were the implementation of a governmental entity's exercise of legislative, quasi-legislative, judicial, or quasi-judicial *457 functions." Id., ¶ 54. The overarching principle is that a "governmental contractor [is] entitled to the same level of immunity as would be accorded to the governmental entity had it been sued directly . . . ." Id., f 31 (citing Lyons, 207 Wis. 2d at 454).
B. The Legislative or Quasi-Legislative Nature of Construction Design Decisions
¶ 22. Decisions regarding the design and placement of individual elements incorporated into larger government construction projects have been held to be legislative or quasi-legislative decisions. For example, in Allstate Insurance v. Metropolitan Sewerage Commission of County of Milwaukee, 80 Wis. 2d 10, 258 N.W.2d 148 (1977), a driver was injured in an accident with a truck which was servicing a manhole located in the middle of the street. The plaintiffs claimed that the relevant governmental entity was negligent for placing the manhole in that particular location, id. at 14, but the court held that governmental immunity applied. "[T]he decisions of the [governmental entity] in planning and designing the system in question, including the placement of the manhole, were legislative acts performed in response to its authority to plan and construct sewer systems . . . ." Id. at 15-16 (footnote omitted). Similarly, "decisions concerning the adoption of a waterworks system, the selection of the specific type of pipe, the placement of the pipe in the ground, and the continued existence of such pipe" are entitled to immunity. Milwaukee Metro. Sewerage Dist. v. City of Milwaukee, 2005 WI 8, ¶ 60, 277 Wis. 2d 635, 691 N.W.2d 658. It is, indeed, well settled that "acts of designing, planning, and implementing are legislative or quasi-legislative acts subject to immunity under *458 [Wis. Stat.] § 893.80(4) ." Bostco LLC v. Milwaukee Metro. Sewerage Dist., 2013 WI 78, ¶ 41 n.21, 350 Wis. 2d 554, 835 N.W.2d 160.
C. Pro Electric's Immunity
¶ 23. We now apply the foregoing principles to the two aspects of Pro Electric's conduct that allegedly caused Petitioners' damages: (1) Pro Electric's conduct in severing the sewer lateral, and (2) Pro Electric's conduct in backfilling the excavation without inspecting the sewer lateral for damage and allowing repairs to be made, pursuant to Wis. Stat. § 182.0175(2)(am). We address each allegation in turn.
1. Pro Electric is Immune From Liability For Severing the Sewer Lateral
¶ 24. Pro Electric is immune from liability for severing the sewer lateral, because the DOT Project Plan provided reasonably precise specifications for Pro Electric's augering, Pro Electric severed the sewer lateral by adhering to those specifications, and DOT adopted the specifications in the exercise of its legislative, quasi-legislative, judicial, or quasi-judicial functions.
¶ 25. Petitioners conceded at oral argument that the specifications in DOT's Project Plan for Pro Electric's augering were reasonably precise and that Pro Electric complied with those specifications exactly. While we are not bound by the concessions of the parties, see State v. Hunt, 2014 WI 102, ¶ 42 n.11, 360 Wis. 2d 576, 851 N.W.2d 434, we agree that a factual basis exists for Petitioners' concessions.
*459 ¶ 26. As for reasonable specificity, DOT directed the exact location for the augering using measured coordinates and specified the dimensions of the auger-ing by directing that SB2 was to be constructed with a Type 10 base. A Type 10 base required a hole with particular dimensions: 30 inches in diameter and 14 feet deep, with between 2 and 4 inches of concrete exposed above ground. These dimensions gave Pro Electric discretion of no more than two inches as to the depth of the hole. DOT also specified the method of excavation: "Bases shall be excavated by use of a circular auger." Clements testified that this was a precise instruction, because variations among types of augers concern only the size, type of teeth, or the kind of truck on which the auger is mounted; otherwise, "[a]n auger's an auger." Given these facts and the fact that Petitioners do not contest this point, we have no difficulty concluding that DOT's specifications for the au-gering were reasonably precise.
¶ 27. Petitioners have also conceded that, when Pro Electric augered the hole for the concrete base for SB2, Pro Electric followed DOT's reasonably precise specifications as to the location and dimensions of the hole and the method of augering. Although Keller, the DOT-retained engineer, had authority to change the location of SB2, Pro Electric did not. As the circuit court concluded, Pro Electric "did what they were told to do by the DOT. In my opinion, there is no genuine issue of material fact as it relates to that." We agree, and we therefore conclude that Pro Electric complied with DOT's reasonably precise specifications as to the specific augering activities that severed the sewer lateral.
¶ 28. Finally, DOT adopted the specifications for Pro Electric's augering in the exercise of its legislative or quasi-legislative functions. The project at issue was governed by the DOT Project Plan, which was prepared *460 at DOT's direction and approved by DOT prior to the start of the project. By providing the final approval to the entire Project Plan, DOT thereby made all the relevant decisions about which traffic signals to replace, where to put them, and even the precise size of concrete bases to use.
¶ 29. In Allstate, we concluded that "the decisions of the [governmental entity] in planning and designing the system in question, including the placement of the manhole, were legislative acts performed in response to its authority to plan and construct sewer systems ...." Allstate, 80 Wis. 2d at 15-16 (footnote omitted). Similarly, in choosing to approve the Project Plan in this case, DOT was exercising its legislatively delegated authority to "direct, undertake and expend state and federal aid for planning, promotion and protection activities in the areas of highways, motor vehicles, [and] traffic law enforcement... ." Wis. Stat. § 85.02(1). The placement of a traffic signal in a highway project is akin to the placement of a manhole in a sewer system, and "[fit is not for the court to be judge or jury to 'second guess' [governmental entities] in these determinations nor to find they are liable for negligence." Allstate, 80 Wis. 2d at 16.[15]
*461 ¶ 30. In light of the foregoing, we agree with the circuit court and court of appeals and hold that Pro Electric severed the sewer lateral as an agent implementing a legislative or quasi-legislative DOT design decision. DOT—not Pro Electric—made the decision to auger that particular hole in that particular place, and all of the evidence suggests that Pro Electric severed the sewer lateral not because of the manner in which Pro Electric chose to do the augering, but simply because the Project Plan directed Pro Electric as to exactly where and how to auger.
2. Pro Electric Is Not Immune From Liability For Backfilling the Excavation Without Inspecting the Sewer Lateral
¶ 31. Petitioners' second allegation is that Pro Electric negligently backfilled its excavation without inspecting the sewer lateral for damage and allowing repairs to be made, despite having a statutory duty to do so. Petitioners argue that, pursuant to Wis. Stat. § 182.0175(2)(am), Pro Electric had an "independent statutory duty to inspect its excavation, to ascertain if the sewer lateral had been or may have been severed or damaged, and to refrain from backfilling its excavation until an inspection was conducted and all necessary repairs were completed."
¶ 32. Petitioners make two arguments as to why Pro Electric may not enjoy immunity from liability for this allegation. First, Petitioners argue that Pro Electric was not acting as DOT's agent in regard to its compliance with Wis. Stat. § 182.0175(2)(am) and instead *462 was "solely responsible for the means and methods of inspecting its excavation, ascertaining if there was any damage, and refraining from backfilling until all necessary repairs were completed." Second, Petitioners argue that the duties imposed by § 182.0175(2)(am) do not implicate legislative, quasi-legislative, judicial, or quasi-judicial functions under our case law.
f 33. Pro Electric does not rebut these arguments. The DOT Highway Work Proposal assigned responsibility to Pro Electric to "Coordinate construction activities with a call to Digger's Hotline or a direct call to the utilities that have facilities in the area as required per statutes" and to "[u]se caution to ensure the integrity of underground facilities." The Project Plan did not provide reasonably precise specifications for how to fulfill these responsibilities, and there would have been ample room for Pro Electric's discretion if, for instance, it had discovered a damaged sewer lateral during excavation. A "contractor may not possess such control over the alleged injury-causing action and still be considered an agent for purposes of governmental contractor immunity under Wis. Stat. § 893.80(4) ." Showers, 350 Wis. 2d 509, ¶ 51.
¶ 34. Therefore, Pro Electric was not acting as DOT's agent in this regard, and immunity would not shield Pro Electric from liability. Given this conclusion, there is no need to proceed to the next step in the analysis and determine whether the duties imposed by Wis. Stat. § 182.0175(2)(am) implicate legislative, quasi-legislative, judicial, or quasi-judicial functions. We therefore do not decide that question.
¶ 35. For these reasons, Pro Electric does not enjoy governmental immunity for a failure to inspect the excavation to look for the severed sewer lateral and to refrain from backfilling until repairs were made. *463 But our discussion does not end here. Rather, we must now apply the traditional summary judgment standards to the facts of the case.
D. Summary Judgment
¶ 36. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Wis. Stat. § 802.08(2). "[A]ny doubts as to the existence of a genuine issue of material fact are resolved against the moving party. However, eviden-tiary facts set forth in the affidavits or other proof are taken as true by a court if not contradicted by opposing affidavits or other proof." L.L.N. v. Clauder, 209 Wis. 2d 674, 684, 563 N.W.2d 434 (1997) (citations omitted).
¶ 37. In order for Petitioners to have a viable common-law negligence claim against Pro Electric for backfilling the excavation without inspecting the sewer lateral for damage and allowing repairs to be made, Petitioners must
plead facts, which if proved true, would establish the following four elements: (1) the existence of a duty of care on the part of the defendant, (2) a breach of that duty of care, (3) a causal connection between the defendant's breach of the duty of care and the plaintiffs injury, and (4) actual loss or damage resulting from the [breach],
Brandenburg v. Briarwood Forestry Servs., LLC, 2014 WI 37, ¶ 6, 354 Wis. 2d 413, 847 N.W.2d 395 (quoting Hoida, Inc. v. M&I Midstate Bank, 2006 WI 69, ¶ 23, 291 Wis. 2d 283, 717 N.W.2d 17).
*464 1. Pro Electric's Duties under Wis. Stat. § 182.0175(2)(am)
¶ 38. As to the element of duty, generally "every person is subject to a duty to exercise ordinary care in all of his or her activities." Id., ¶ 7 (quoting Behrendt v. Gulf Underwriters Ins., 2009 WI 71, ¶ 3, 318 Wis. 2d 622, 768 N.W.2d 568). In this case, we asked the parties to brief the relevance of the Digger's Hotline statute, in particular Wis. Stat. § 182.0175(2), including a discussion of whether the facts in the record demonstrate compliance with the statute. Although the parties disagree as to whether Pro Electric complied with § 182.0175(2)(am), neither has disputed the notion that demonstrating noncompliance with § 182.0175(2)(am) is essential to Petitioners' claim that Pro Electric was negligent in backfilling the excavation without inspecting the sewer lateral for damage and allowing repairs to be made. Pro Electric conceded at oral argument that noncompliance with § 182.0175(2)(am) would support a negligence claim, and Petitioners have not presented any argument as to how the duty of ordinary care in regard to the specifically alleged negligent conduct would differ from the duties imposed by § I82.0l75(2)(am).[16] Therefore, we assume for purposes of deciding this case that Pro Electric's duty of care under the circumstances here is coextensive with the requirements of § 182.0175(2)(am).
*465 ¶ 39. Subsection (2)(am) is titled "Excavation notice" and begins by providing that an excavator shall "[plrovide advance notice [to Digger's Hotline] not less than 3 working days before the start of nonemergency excavation." Wis. Stat. § 182.0175(2)(am)l. Subsection (2)(am) also requires that, while excavating, the excavator must maintain minimum clearances around any "marking for an unexposed transmission facility that is marked under sub. (2m)," though it may reduce that clearance "[w]hen the underground transmission facility becomes exposed or if the transmission facility is already exposed." § 182.0175(2)(am)3. Additionally, after the excavation is complete, the excavator must, "[b]efore backfilling, inspect all transmission facilities exposed during excavation to ascertain if the transmission facilities have been or may have been struck, damaged, dislocated or disrupted," and shall "[r]efrain from backfilling an excavation until an inspection is conducted and any necessary repairs have been made by the owner of the transmission facility." § 182.0175(2)(am)6.~6m.
2. There Is No Issue of Material Fact As To Whether Pro Electric Complied With Its Duties Under Wis. Stat. § 182.0175(2)(am)
¶ 40. The undisputed facts in the record establish that Pro Electric complied with its duties under *466 Wis. Stat. § 182.0175(2)(am). There is no dispute that Pro Electric contacted Digger's Hotline at least three days before beginning excavation. Nor is there any evidence to indicate the presence of any markings indicating that the sewer lateral was in the way of the excavation. The statutes clearly impose the duty to mark buried transmission facilities—including sewer laterals—on their owners, not on an excavator. § 182.0175(2m)(a)(2). Nothing in the record permits a reasonable inference that the presence of the sewer lateral was anything other than a surprise to all involved.
¶ 41. Further, there are no facts from which it could be inferred that the sewer lateral was a "transmission facilit[y] exposed during excavation," triggering Pro Electric's duty to inspect it for damage and refrain from backfilling until repairs could be made. Wis. Stat. § 182.0175(2)(am)6.-6m. Clements explained in his deposition that augering generally pulverizes and grinds the material together, making it highly unlikely that pieces of a clay pipe would be identifiable in clay soil. He testified that when Pro Electric hit a different sewer lateral on a previous excavation, Pro Electric noticed it because pieces of green PVC material were visible amid the soil that was coming up. But here, both the buried sewer lateral and the surrounding soil consisted of clay-colored material. Furthermore, the hole was relatively narrow, being 14 feet deep while only 30 inches wide. Augering in this situation, Clements stated, generally "creates a situation where the technician operating the auger has no ability to see into the hole which is being augered." The lateral here could not have been open to view, because of the way that an auger typically "will push everything into any voids in the hole, so as you look in a hole *467 you will not see a pipe or anything because [the hole] gets packed with dirt." Clements further stated that, although Keller was supervising Pro Electric's work and one of Pro Electric's employees was assigned to monitor the auger and periodically clean it with a shovel, no one reported seeing any indication that they had hit a sewer lateral.
¶ 42. Petitioners do not dispute these facts except to argue that, because Clements was not present at the job site, his deposition cannot "conclusively establish□ that Pro Electric inspected its excavation, ascertained if the sewer lateral had been or may have been severed or damaged, and refrained from backfilling its excavation ... as required by Wis. Stat. § 182.0175(2)(am)." However, the statute does not require Pro Electric to inspect its excavation; rather, it requires inspection of transmission facilities exposed during the excavation. Wis. Stat. § 182.0175(2)(am)6.-6m. The only evidence Petitioners produced in this regard was a photograph taken after the fact, which depicted wider excavations done later to repair the sewer lateral and in no way represented that the sewer lateral would have been exposed to Pro Electric at the time of augering. A party opposing summary judgment "must show, by affidavit or other proof, the existence of disputed material facts or undisputed material facts from which reasonable alternative inferences may be drawn that are sufficient to entitle the opposing party to a trial." Clauder, 209 Wis. 2d at 683. Petitioners have not met this burden, because the undisputed material facts they have presented do not support a reasonable inference that Pro Electric violated § 182.0175(2)(am).
f 43. Therefore, we hold that Petitioner has not identified any material fact supporting a reasonable *468 inference that Pro Electric failed to comply with its duties under Wis. Stat. § 182.0175(2)(am). Pro Electric did what it was required to do under the statute, and based on the record before us, Petitioners' attempts to suggest that the sewer lateral was exposed to Pro Electric during the excavation amount to mere speculation. Pro Electric is therefore entitled to summary judgment.
V. CONCLUSION
f 44. We hold that Pro Electric is immune from liability for Petitioners' allegations that it was negligent in severing the sewer lateral, and we hold that Pro Electric is entitled to summary judgment on Petitioners' allegation that it was negligent in backfilling the excavation without inspecting the sewer lateral for damage and allowing repairs to be made pursuant to Wis. Stat. § 182.0175(2)(am).
¶ 45. Pro Electric is immune from liability for severing the sewer lateral, because it acted in accordance with reasonably precise design specifications adopted by a governmental entity in the exercise of its legislative, quasi-legislative, judicial, or quasi-judicial functions. At the same time, Pro Electric is not immune from liability for backfilling without inspecting the sewer lateral pursuant to Wis. Stat. § 182.0175(2)(am), because DOT did not provide Pro Electric with precise specifications for inspecting damaged utilities before backfilling pursuant to § 182.0175(2)(am), so Pro Electric was not DOT's agent with regard to these duties. Ultimately, however we affirm the circuit court's grant of summary judgment on the factual record before us. We do so because the undisputed material facts do not support a reasonable inference that Pro Electric failed *469 to comply with its duties in § 182.0175(2)(am). For these reasons, we affirm the decision of the court of appeals.
By the Court.—The decision of the court of appeals is affirmed.

 The Honorable James R. Kieffer presiding.

 A "sewer lateral" is an underground pipe that connects a property to the sewer system. See Wis. Stat. § 182.0175(2m)(b) (2011-12) (requiring local government units to "mark the locations within the public right-of-way of all laterals connected to the sewer or water facilities . ..."). All subsequent references to the Wisconsin Statutes are to the 2011-12 version unless otherwise indicated.

 Wis. Stat. § 893.80(4) provides:
No suit may be brought against any volunteer fire company organized under ch. 213, political corporation, governmental subdivision or any agency thereof for the intentional torts of its officers, officials, agents or employees nor may any suit be brought against such corporation, subdivision or agency or volunteer fire company or against its officers, officials, agents or employees for acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions.

 Among other duties, Wis. Stat. § 182.0175(2)(am) requires an excavator to "do all of the following":
6. Before backfilling, inspect all transmission facilities exposed during excavation to ascertain if the transmission facilities have been or may have been struck, damaged, dislocated or disrupted.
6m. Refrain from backfilling an excavation until an inspection is conducted and any necessary repairs have been made by the owner of the transmission facility.

 Article 6 of the Special Provisions in the Highway Work Proposal was entitled "Utilities," and among its other provisions it directed contractors to "[cjoordinate construction activities with a call to Diggers Hotline or a direct call to the utilities that have facilities in the area as required per statutes. Use caution to ensure the integrity of underground facilities and maintain code clearances from overhead facilities at all times."

 Although Pro Electric was a subcontractor, we use the term "contractor" throughout our opinion because "immunity *449 extends to a subcontractor even though it has a contract with a general contractor rather than with a governmental authority." Bronfeld v. Pember Cos., 2010 WI App 150, ¶ 20 n.3, 330 Wis. 2d 123, 792 N.W.2d 222. The "reasoning for adopting the defense for contractors also applies to subcontractors," because "it is just as unfair for a subcontractor to be subjected to suit for carrying out a governmental directive as it is for the party directly contracting with the government." Jankee v. Clark Cty., 222 Wis. 2d 151, 165-66, 585 N.W.2d 913 (Ct. App. 1998), rev'd on other grounds, 2000 WI 64, 235 Wis. 2d 700, 612 N.W.2d 297.

 The Project Plan provided for SB2 to be located at Station 499+66.8 and at Location 86.8 LT. These coordinates were measured in feet and identified the location to within a tenth of a foot.

 As defined in Wis. Stat. § 182.0175(l)(b), "excavation" means "any operation in which earth, rock or other material in *450 or on the ground is moved, removed or otherwise displaced by means of any tools, equipment or explosives and includes ... augering. . . ." An "excavator" is "a person who engages in excavation." § 182.0175(l)(bm).

 As defined in Wis. Stat. § 182.0175(1)(c), "transmission facilities" includes "all lines, pipelines, wires, cables, ducts, wirelines and associated facilities, whether underground or aboveground, . . . utility facilities, government-owned facilities, facilities transporting hazardous materials, communications and data facilities, drainage and water facilities and sewer systems."

 Wis. Stat. § 182.0175(lm) requires owners of transmission facilities to be members of the Digger's Hotline organization and requires Digger's Hotline to "[ajccept notices of intended excavation activity" and "[p]romptly transmit notice information to affected-member transmission facilities owners." § 182.0175(1m)(a), (d)3., (d)6. Subsection (2m) makes it the owner's duty to "[r]espond to an excavation notice within 3 working days by marking the location of transmission facilities and, if applicable, laterals as provided under par. (b) in the area described in the excavation notice." § 182.0175(2m)(a)2.

 Clements testified that, during an earlier augering excavation on the same DOT project, Pro Electric's employees noticed pieces of green PVC material coming up with the dirt. Keller determined that it was a damaged sewer lateral, and she instructed Pro Electric to move the excavation to a different location in order to allow a sewer contractor to make repairs.

 Clements explained that the similarity of the materials is significant because of how augering works. An auger, he testified,
grinds and pulverizes the ground and slowly starts bringing dirt to the surface. If the sewer line would have been PVC we would have immediately saw that there was something there. As an auger augers it's pushing everything up, and it will push everything into any voids in the hole, so as you look in a hole you will not see a pipe or anything because it gets packed with dirt. They had no way of knowing. If it would have been a newer one, yes, we would have known right away.

 As we emphasized in Showers Appraisals, LLC v. Musson Bros., 2013 WI 79, 350 Wis. 2d 509, 835 N.W.2d 226, "Although some of our cases have equated § 893.80(4)'s 'legislative, quasi-legislative, judicial or quasi-judicial' standard with the term 'discretionary, and although our decision is not intended in any way to alter that standard," the statute is best interpreted "by applying the legislature's chosen plain language, rather than a judicial distillation thereof." Id., ¶ 35 (citations omitted).

 The decision in Estate of Lyons v. CNA Insurance, 207 Wis. 2d 446, 558 N.W.2d 658 (Ct. App. 1996), also considered a contractor's independent "duty to the public [not to] withhold *456 information about dangers that the government might not know about." Id. at 457 (citing Boyle v. United Techs. Corp., 487 U.S. 500, 512-13 (1988)). However, Showers clarified that this part of Lyons "does not bear on whether statutory agency is present." Showers, 350 Wis. 2d 509, ¶ 37 n.15.

 Petitioners argue that "DOT's directive was not the injury-causing act; the injury-causing act was Pro Electric's negligent severing of the sewer lateral through its performance of construction work." However, Petitioners have failed to demonstrate a meaningful distinction between the two in this case. Petitioners concede that the DOT designs directed Pro Electric to excavate using a circular auger to a precise depth in a precise location, and neither side disputes the fact that this is the conduct that severed the sewer lateral. In this situation, immunity depends not on the character of the contractor's acts but "upon the immunity of the governmental act or decision that the agent was implementing when it caused an injury." Showers, 350 Wis. 2d 509, ¶ 35 (emphasis added). Therefore, *461 our focus is properly on DOT's decision to adopt the specifications that caused Pro Electric to sever the sewer lateral.

 Petitioners allege in their Second Amended Complaint that "it was obvious to [Pro Electric's] workers at the time that they were drilling through a sewer lateral," and that Pro Electric was therefore negligent when it "proceeded with the installation of the light pole without warning any of the occupants of the building that the sewer lateral was severed *465 nor did they take remedial action to repair or reroute the sewer lateral around the pole." In their briefs before this court, Petitioners characterize these allegations solely in terms of the duties imposed by Wis. Stat. § 182.0175(2)(am), arguing that Pro Electric had an "independent statutory duty to inspect its excavation, to ascertain if the sewer lateral had been or may have been severed or damaged, and to refrain from backfilling its excavation until an inspection was conducted and all necessary repairs were completed" (emphasis added).